THE STATE OF WYOMING,
*Plaintiff and Respondent,*

v.

STEPHEN A. HICKENBOTTOM,
*Defendant and Appellant.*

(No. 2342; February 25th, 1947; 178 Pac. 2d. 119)

42

44

For the plaintiff and respondent there was a brief by Louis J. O'Marr, Attorney General, Hal E. Morris, Deputy Attorney General, and Frank M. Gallivan, Assistant Attorney General, all of Cheyenne, Wyoming, and oral argument by Hal E. Morris, Deputy Attorney General.

For defendant and appellant there was a brief and oral argument by R. G. Diefenderfer of Sheridan, Wyoming.

46

## OPINION

RINER, Chief Justice.

Stephen A. Hickenbottom, hereinafter usually referred to as either the defendant or appellant was convicted in the District Court of Crook County of unlawfully and feloniously branding, altering and defacing the brand of ten head of sheep, five ewes and five lambs, the ewes being stated to be of the value of eight dollars and the lambs of four dollars each respectively, owned by one Peter Munk, with intent to steal the animals, and the appellant bring the record and judgment here by direct appeal for review by this court.

The information filed by the County and Prosecuting Attorney of Crook County against the defendant contained two counts, the first one charging him with the larceny of the sheep aforesaid and the second count being set forth in this language:

"That on the 7th day of July, A. D. 1945 at and in the County of Crook in the State of Wyoming, the said Stephen A. Hickenbottom, did then and there unlawfully and feloniously brand, and alter and deface the brand of, ten head of sheep, of the personal property of the said Peter Munk, consisting of five ewes and five lambs, the said ewes being then and there of the value of Eight Dollars each, and the said lambs being then and there of the value of Four Dollars each, within intent thereby to steal the aforesaid sheep and to deprive the owner, the said Peter Munk thereof".

With reference to the first count of the information, though the issues thereon were submitted to them by instructions and separate forms of verdict, the jury returned no verdict whatever relative to that particular charge. Both the Attorney General and counsel for appellant agree that this constituted an acquittal of the defendant on that charge. In that conclusion we also concur, 23 C. J. S. 1090, 1091 § 1403 stating upon the authority of cases from the appellate courts of some eighteen separate jurisdictions of the nation that:

"A conviction and judgment on one of several counts, with no verdict on the others, is an acquittal as to the other counts, especially where the jury is given separate forms of verdicts covering each count, and at least where accused is charged with distinct offenses in the several counts;"

It will be unnecessary to consider any matters relative to that phase of the prosecution except as hereinafter indicated.

The facts disclosed by the record which are pertinent, material to be recited and considered on this appeal are substantially these:

Appellant owns and manages a ranch some three miles southwest of the town of Moorcroft, Wyoming where he has been engaged in the live stock business since 1913. He has run about four to five hundred head of sheep during each of the last four years preceding the middle of October, 1945 but he has been in the sheep raising business itself since about 1934. On the fifteenth day of June, 1945 he had 479 head of sheep. However, he still runs some cattle. His ranch adjoins on the north, the ranch of one Mrs. Mary Butler who is also engaged in the business of running sheep. The residence buildings on these two ranches are less than a mile apart and the line fence between them is not far from either.

About July 1, 1945 a crew of Mexicans began sheep shearing operations at the Butler ranch for the convenience not only of Mrs. Butler but of the neighbors who owned sheep. On the day last mentioned, the Butler sheep were shorn. The following day a small flock of sheep, some forty-five or fifty in number, belonging to one Peter Munk who was in the employ of Mrs. Butler as a sheep herder, were processed. Thereafter, a much larger band of sheep, about 426 in number, and owned by Charles Slattery, were shorn by the crew aforesaid and about noon of the same day, Mr. Hickenbottom arrived at the Butler ranch with his sheep, 404 in number. These animals were then sheared and about four o'clock that afternoon, he started back to his home ranch with them.

It appears that a few sheep, six ewes and six lambs marked with a black paint "M" were taken from the Munk flock and placed by themselves in a small pen at the Butler ranch immediately after they were shorn. This black paint mark was put on by means of a wire bent in the form of a letter "M" dipped in black paint and then pressed against the animals in two places, viz. their hips and necks, although one of the witnesses noticed the marks on their sides. Munk testified that this mark was his "brand" and it seems to be so referred to in the record generally.

After the Hickenbottom herd started homeward and were out of sight but their bleating could still be heard, Mrs. Butler in the presence of Mrs. Slattery released the six ewes and lambs heretofore mentioned from the small pen in which they had been previously placed as described above, with the consequence that these animals immediately ran away from the two women despite their efforts to prevent that action and these sheep were last seen moving in a northerly direction toward the Hickenbottom ranch. Their value seems to have

been proven to be somewhere around ten or twelve dollars for a ewe and a lamb together.

After Hickenbottom's sheep had been shorn he found, as he testified, that out of the 479 head he owned, only 404 had been sheared according to actual count, hence he naturally inferred that there were some others missing which had not been gathered, although a careful search had been made for all sheep on the ranch prior to driving them to the shearing pens. He arrived home too late the evening of July 2nd to begin hunting for these other sheep. Early next morning he and his two sons went out to try and find the absent animals and 65 head of sheep were discovered about a mile east of his ranch buildings and close to the line fence between Mrs. Butler's ranch and his. At the place where these sheep were found, the 35 inch sheep wire fence was secure as to the top and bottom wires but the middle wires appeared to have been cut with sharp pliers and bent backwards. There were sheep tracks going through this hole in the fence and coming back. In this bunch of sheep thus discovered were six ewes and six lambs with the black "M" on them. The entire bunch of 65 sheep was thereupon taken to the Hickenbottom corrals and those with the "M" marked upon them were particularly examined; thereafter all were turned loose as sheep owned by Hickenbottom, with the exception of one ewe and one lamb to which Hickenbottom made no claim whatsoever. On the afternoon of July 9th and the forenoon of July 10th following, the unshorn sheep in this bunch of 65—60 in number—were sheared at the Hickenbottom ranch by one Fred McGurn who testified to the fact.

It seems that no effort in any way was made by Mrs. Butler, Munk, or anyone else to follow immediately and retake this bunch of sheep which had been released

by her the evening of July 2nd. Neither was anything done about the matter during the course of the next two days. However, Mrs. Butler testified that some time during the fifth day of July, 1945 she had occasion to go to the town of Moorcroft. She drove past the Hickenbottom house and noticed there "right along the road" four ewes and lambs branded with a black "M" which she says she recognized as the same sheep which had escaped from her place the second of July. At this time these sheep had only the black "M" brand upon them and no other visible mark, as she said. This visit of Mrs. Butler to Moorcroft occurred on Thursday of that week. Nothing more was done concerning these animals until Friday night following when Mrs. Butler told her employe Branson to go over to see Mr. Hickenbottom and "see about getting those ewes". The following morning, Saturday, the 7th, "pretty early" Branson went over to the neighboring ranch, saw Hickenbottom and according to Branson it was arranged between them that at 7:00 o'clock that evening Hickenbottom would have his sheep in the corral at his place and that they would "work them in the corral".

After Branson had returned to the Butler ranch, the ten shorn sheep claimed by Hickenbottom were put in a chute and, to quote the latter's testimony, "I got a bucket of paint and poured a little of the top off, the thin part of the paint, and then I took an old paint brush and daubed in the paint and I daubed around this 'M' and maybe a little across one corner, something like that, but I put that on several different—well, on the sheep about that big a square (indicating), just daubed as you daub around for marks, not as my brand; my brand is a beer bottle brand." He also stated that the blue paint was not put on for his brand; that he put large blotches on them so they would not look like his brand; and that he put the blue paint on

not to prevent their identificaton as Peter Munk's sheep but it was applied for the purpose of identification for anybody it might concern to look over.

When Branson arrived a little after 7:00 o'clock P. M. as arranged, the sheep were, however, not in the corral, so Hickenbottom and his children and Branson took auto "pick-up" cars and gathered the sheep as fast as could be done that way. Branson looked through them and he "couldn't see any black 'M' in them" but he did see an ewe, as he testified, "carrying a lot of paint" more than "Hickenbottom's sheep had on." Branson then told Hickenbottom that the sheep in question must be there in another bunch as Mrs. Butler had seen them. Then he returned and informed Mrs. Butler of what he had done and what he had seen.

On Monday morning, July 9th Mrs. Butler went to Sundance, the County seat of Crook County and made arrangements with the Sheriff of that County, W. H. Blakeman, to come and investigate the matter as a complaint for stealing sheep. He arrived at the Butler ranch about noon. Thereafter, accompanied by Mrs. Butler, Munk, and Branson, the officer went to the Hickenbottom ranch and with Hickenbottom's assistance looked over his sheep. Five ewes and five lambs were found which upon inspection by the sheriff showed black paint "M's" on the wool over which had been placed blotches of blue paint. The black "M" marks on another ewe and another lamb were not disturbed. The officer testified that the rest of Hickenbottom's sheep had two blue color round spots on each animal of 2½" in diameter on shoulder and hip, while these blue paint marks on the five ewes and five lambs were larger and on the sides of the animals. Hickenbottom told the sheriff that he claimed these ten sheep as his and when asked by that officer "how it came about he put his blue paint over this black 'M'," the sheriff testified Hicken-

bottom said: "I was out fifteen head of sheep; what would you do if a bunch came into your bunch with your earmark—what would you do?"

The 12 sheep aforesaid were thereupon taken by Blakeman from Hickenbottom and were delivered into the custody of Mrs. Butler at her ranch where they were kept until the trial of this cause at Sundance. Thereafter the County and Prosecuting Attorney of Crook County filed an information in the District Court of that county setting forth the charges contained in the two counts as already described.

In the course of the trial, Hickenbottom testified that the ten sheep in question were part of a band of 112 head of old ewes and 80 lambs which were purchased by him from two men, Russell Twiford and Emil Evey, who dealt extensively in the business of selling sheep, these animals being delivered to Hickenbottom at the town of Moorcroft's stock yards on May 15, 1945; that at that time, Hickenbottom cut the top out of a can, dipped that in black paint and put it on the hip and on the neck of each sheep then purchased; that he found the dim imprint of that brand or mark on each one of these five ewes that were branded with Peter Munk's black "M"; that he was absolutely positive the five ewes and five lambs in question were his sheep; that the ear marks on these sheep compared exactly with those of the other sheep he bought from Twiford and Evey; that he knew the sheep owned by Mrs. Butler and Peter Munk and they did not have any fine-wooled sheep in their bands; that the sheep in question were Rambouillet, tight, fine-wooled sheep. Both Twiford and Evey who were witnesses for the defendant after examining both the Butler and the Munk sheep and the sheep in question previous to the trial, stated as witnesses for the defense that the five ewes and lambs aforesaid were fine-wooled sheep of the Rambouillet

type. Identification through individual peculiarities of some of these ten sheep were also made by the defendant and members of his family as being among those obtained from Twiford and Evey.

It is undisputed that Hickenbottom made no effort to conceal these sheep from being observed by anyone; that after he found and examined them, he allowed them to run openly with his own animals; that when the sheriff came to the Hickenbottom ranch, Hickenbottom aided him in the examination of the sheep involved and interfered at no time with the officer's investigation of the matter. Mrs. Butler and Munk, however, each testified that the sheep were Munk's, the former admitting on cross examination that she began this prosecution herself, though Munk signed the verified complaint before the Justice of the Peace charging Hickenbottom with the larceny of these ten head of sheep.

Additional facts as may be found necessary in considering the contentions of the parties will be hereinafter mentioned.

It is urged on behalf of appellant that the information as it concerns the second count herein quoted above, is defective in that (a) the word "within" was used instead of "with" preceding the word "intent", and (b) the count does not allege that the brand mentioned therein was recorded.

Before considering these contentions separately, it may be observed that the defendant pleaded "not guilty" and did not attack the information at any time in the course of the proceedings against him by motion to quash, plea in abatement, demurrer, or motion in arrest of judgment, but undertakes to raise the points above suggested for the first time on this appeal.

Section 33-508 W. R. S., 1931 provides: "The accused shall be taken to have waived all defect which may be excepted to by a motion to quash, or a plea in abatement, by demurring to an indictment or information, or pleading in bar, or not guilty." With this section should be recalled section 33-504 W. R. S. 1931 reading: "A motion to quash may be made in all cases where there is a defect apparent upon the face of the record, including defects in form of the indictment, or in the manner in which the offense is charged."

The language of section 33-415 W. R. S. 1931 is also pertinent and this in part is: "No indictment shall be deemed invalid, nor shall the trial, judgment or other proceedings be stayed, arrested or in any manner affected: * * * * for any surplusage or repugnant allegation where there is sufficient matter alleged to indicate the crime or person charged; nor for want of the averment of any matter not necessary to be proved; nor for any other defect or imperfection which does not tend to the prejudice of the substantial rights of the defendent upon the merits." Section 33-431 W. R. S. 1931 directs that "All provisions of law, applying to prosecutions upon indictments * * * shall in the same manner and to the same extent as near as may be, apply to informations, and all prosecutions and proceedings thereon."

Under statutory provisions of this character, slight verbal inaccuracies or typographical or clerical errors and misspelling which are reasonably obvious are not to be favorably regarded but objections on account thereof at least must be raised by motion to quash and if not so raised are waived by pleading "not guilty", as was done here. See 31 C. J. 656, 657 § 177, 42 C. J. S. 970, 971 § 96 and cases cited in these texts.

For example in Small vs. State 116 Tex. Cr. R. 41, 32 S. W. 2d 860, the indictment charged the defendant

"will" malice aforethought made an assault with intent to kill and it was held to sufficiently inform defendant that "with" malice aforethought was intended. On the point the court said:

"No motion to quash this indictment was made in the trial court before the trial, but the question seems attempted to be raised in the motion in arrest of judgment. Such matter should ordinarily be raised in a motion to quash. Mosier v. State, 90 Tex. Cr. R. 136, 234 S. W. 225. We, however, think it impossible that the accused was misled, or that he was not informed by what appears to us to be a plain typographical error or clerical mistake, that the pleader intended to charge that the assault was 'with malice aforethought.' The expression 'with malice aforethought' is a sort of formula, well understood and settled in practice as a necessary element in certain offenses, that of assault to murder being one of them, and there seems no room for serious doubt of the proposition that, in the instant case, when viewed in the light of the context, the pleader intended to say that the assault was 'with malice aforethought,' and that the accused was sufficiently informed of the intention of the pleading."

And in State vs. Brown 180 La. 299, 156 So. 359 speaking of an indictment in even a capital case it was decided that the use of the word "statue" instead of the word "statute" could properly be amended so as to read "contrary to the form of the statute of the state". However, the court said:

"The fact that the indictment was returned in a capital case, in which an indictment, instead of a bill of information, is required, does not prevent its amendment to cure a mere formal and obvious defect of spelling. There was, most likely, no occasion to amend the indictment. Jurisprudence establishes that an error of spelling or of grammar does not vitiate an indictment unless the sense is so obscured thereby that a person of ordinary intelligence cannot determine the meaning intended to be conveyed from the context. State v. Hornsby, 8 Rob. 554, 41 Am. Dec. 305; State v. Karn,

16 La. Ann. 183; State v. Given, 32 La. Ann. 782; State v. Ford, 38 La. Ann. 797."

We consider there is no merit in the first of these contentions. Relative to the second, we are obliged to reach the same conclusion. Concerning an indictment or information undertaking to charge a statutory offense as is the case in the second count of the information in question, the rule would appear to be that where the charge follows the statutory language and such language contains all that is essential to constitute the crime and apprise the accused of the nature of the crime charged, this is sufficient. It will be observed that the second count of the information before us is a complete charge which follows the wording of section 32-330 W. R. S. 1931 very closely. That statute does not seem to require that the brand to which it refers should be a recorded brand. The word "brand" is not defined in it or in any other statute to which our attention has been called. Words used in an information are usually given their ordinary and commonly accepted meaning. Cooper v. State, 123 Neb. 605, 243 N. W. 837; State v. Rousten 84 New Hampshire 140, 146 Atl. 870.

The Century Dictionary defines the word "brand" as "a mark made by burning with a hot iron * * * upon an animal as a means of identification; a trade mark; hence a mark made in other ways than by burning as by cutting or paint." It is common knowledge in this jurisdiction that sheep are not branded with a hot iron as are cattle and horses but with paint marks. The legislative history of the branding laws of this state discloses that when the sheep industry grew apace, the previous meaning of "brand" was enlarged to include paint or other marks.

Appellant's point here urged is, as we have noted, that the brand laws of the state require a "brand" to

be recorded and that no person owns a "brand" which is not recorded and hence that it must be alleged in the information that the "brand" was recorded in order to charge a crime under the statute. Even if we were to assume for the sake of argument merely, as appellants insist, that a "brand" legally recorded is the only one intended by section 32-330 W. R. S. 1931 supra, then as nothing appears in the information to show that the word "brand" did not refer to a recorded brand, it must be presumed that a legal brand was intended. No attack upon the information was in any form made by appellant either before or during the trial in the District Court and hence under the provisions of section 33-508 W. R. S. 1931 supra, any defect therein of the character of which complaint is now made was waived. Indeed no issue of this nature was even suggested or presented to the trial court for its consideration. No authorities are advanced in support of the contention and we have found none. We reach the conclusion under section 33-415 in part quoted above that the "defect or imperfection" urged did not "tend to the prejudice of the substantial rights of the defendant upon the merits".

It is insisted that there was error prejudicial to the defendant because forms of verdict for the jury's use were submitted to it finding the defendant guilty on the first count of the information and also on the second count thereof, while only a form of general verdict of "not guilty" was submitted to it. An all sufficient answer to this contention is that appellant by reason of the verdict given is in no position to object as the jury used a form of verdict which expressed its views and there is no showing that it desired to use a different verdict. No statute is drawn to our notice that makes it the duty of the trial judge to furnish forms of verdict to the jury, though that is usually done in

this jurisdiction. The law appears to adopt the view that the jury is presumed to be able to formulate its own conclusions. People v. Corbin 118 Cal. App. 392, 5 Pac. 2d 460; People v. Hill 116 Cal. 562, 48 Pac. 711. In the case at bar the jury could readily have changed the form of the general verdict of "not guilty" which they had in their hands to a verdict of "not guilty" upon either of the counts, one and two, had they so desired. It may not be out of place to suggest that the better practice is to furnish separate and specific forms for every legal conclusion of the jury that can be anticipated; this for the reason that it is for their convenience and facilitates their work. 23 C. J. S. 873 § 1293.

The contention is made that because the jury failed to return any verdict at all as to the first count in the information which, as before stated, was one charging the defendant with larceny of the sheep in question, and as that failure was an acquittal of the defendant on that charge, he could not properly be found guilty on the second count of the information; in short, that as the jury did not find the defendant guilty of larceny of the sheep they could not find him guilty of misbranding with intent to steal the animals in question, the doctrine of inconsistency of verdicts being invoked.

We find no merit in this contention. 23 C. J. S. 1093, § 1403 says that:

"Where an accused is charged with separate and distinct crimes, although of a similar character, in two or more counts, a verdict of acquittal on one or more counts and of conviction on the others is not ordinarily or necessarily inconsistent, at least where each offense requires different evidence."

Elaborating this principle, the same text, page 1094, 1095, same section, further says:

"When accused is convicted on one count and is acquitted on another count, the test is whether the essential elements in the count wherein accused is acquitted are

identical and necessary to proof of conviction on the guilt count."

In Dunn v. U. S. 284 U. S. 390, 52 S. Ct. 189, 76 L. Ed. 356, Mr. Justice Holmes delivering the opinion of the court used this language:

"Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment. Latham v. Reg. 5 Best & S. 635, 642, 643, 122 Eng. Reprint, 968; Selvester v. United States, 170 U. S. 262, 42 L. Ed. 1029, 18 S. Ct. 580. If separate indictments had been presented against the defendant for possession and for maintenance of a nuisance, and had been separately tried, the same evidence being offered in support of each, an acquittal on one could not be pleaded as res judicata of the other. Where the offenses are separately charged in the counts of a single indictment the same rule must hold."

Concerning this view of the point as expressed by the Supreme Court of the United States, the Supreme Court Appellate Division in People v. Sciascia 268 App. Div. 14, 48 N. Y. S. 2d 428, remarked:

"This Principle is almost universally followed by our sister States."

In People v. Hickman 31 Cal. App. 2d 4, 87 Pac. 2d 80 it is said:

"When the defendant is convicted of one and acquitted upon another count, the test is whether or not the essential elements in the count wherein the defendant was acquitted are identical and necessary to proof of conviction on the guilt count. * * * A single act may be a violation of more than one statute. If a single vital fact is necessary in proof of one offense, but not necessary in the other, an acquittal is not a bar and is not inconsistent with the conviction of the other.

"In People v. Coltrin, 5 Cal. 2d 649, 661, 55 P. 2d 1161, 1167, quoting from People v. Day, 199 Cal. 78, 248 P. 250, the court said: 'It may be conceded that, if the two counts stated precisely the same offense, that an acquit-

tal upon one count would operate as an acquittal upon the other count. * * * It is not the great similarity in most of the facts constituting separate offenses but the presence of a fact necessary in one offense and absent in another, that determines whether offenses are separate.' "

It was quite pertinently indicated in 107 Pa. Super. Ct. R. 595, 164 Atl. 124 that:

"Viewing the matter from another standpoint, it is apparent that there was not any inconsistency in the verdicts on the fourth and fifth counts. The verdicts on these counts are not held to be inconsistent unless the jury in reaching its verdict of acquittal on the fourth count necessarily found not proved some essential element in the fifth count. When the jury replied 'Not guilty' to the fourth count, they did not find that all the necessary elements in that count were not proved, but only that the necessary elements were not all proved. It is therefore impossible to say that the verdicts are inconsistent."

In that case it was held that a verdict of "not guilty" of willfully making an illegal contract as charged in one count of an indictment was not inconsistent with a verdict of guilty of willful payment of city funds in connection with such illegal contract as charged in another.

Finally, it is urged that there was prejudical error in the refusal of the District Court to give the following instruction lettered "A":

"You are instructed that if you find from the evidence that the defendant had reason to believe, and did honestly believe, that the sheep in question in this case, were his own, then you will find the defendant not guilty."

The reason assigned for this refusal was that the said instruction was covered by other instructions given the jury. Concerning this instruction, counsel for the respondent admit in their brief:

"From our review of the record we believe that there is sufficient evidence in this case to warrant the giving of such an instruction, it having been one of the theories of the defense;"

and also that:

"It is clear that the defendant, for a defense, relied upon the claim that he owned the sheep in question."

Counsel also concedes that:

"the accused in a criminal case is entitled to instructions defining the law applicable to his theory and covering his defense if there is competent evidence tending to substantiate his theory."

See also Linde v. State 61 Okla. Cr. R. 136, 66 Pac. 2d 527, infra.

It is pointed out in behalf of the State that the District Court after defining the material elements of the offense charged in count 2 of the information, told the jury that in the event the State failed to prove them they should acquit the defendant. These material elements were stated to be:

"That on or about the 7th day of July, A. D. 1945, the defendant did unlawfully and feloniously brand, alter and deface the brand of ten head of sheep of value and the personal property of one Peter Munk, with the intent thereby to steal and take away the said sheep and to deprive the owner, Peter Munk, thereof;"

The jury was also told that:

"You are instructed that the felonious intent charged in the Information is one of the material elements of the crime charged and it is incumbent on the State to prove such felonious intent beyond all reasonable doubt."

It is urged that these instructions were sufficient in as much as an honest claim of ownership deals with the question of criminal intent. That is true, of course,

but these instructions no where affirmatively state that an honest belief on the part of the defendant in his ownership of the sheep in question would be a good defense.

In Winfrey v. State 84 Tex. Cr. R. 579, 209 S. W. 151 where the appellant was convicted of stealing cattle, upon appeal, this judgment was reversed. In the course of the opinion the court said:

"The court charged the jury, with reference to this question of ownership and title, that if they should believe from the evidence that said one head of cattle was the property of Joe Winfrey, or one of his children, at the time of the taking as charged in the indictment, they should acquit. The bill of exceptions recites that appellant excepted to the charge of the court, the language being too general, and in this connection asked the court to charge the jury that if they should believe this animal to be the property of appellant, or one of his family, or there was a reasonable doubt of it, they should acquit. This charge was refused. We are of opinion it should have been given."

Another case from the same jurisdiction is that of Allen v. State, 125 Tex. Cr. R. 243, 67 S. W. 2d 873 where also there was a conviction of cattle theft. The testimony of the defendant was that the calf belonged to him and that he butchered it as his own. He said that he had raised it; that it was given to him by a man named S. who testified he had given appellant a number of calves. Reversing the judgment, this was said by the reviewing court:

"In his charge to the jury no instruction was given upon the defensive theory. Appellant presented a special charge in due season, in which he sought to have the jury told as follows:

" 'You are instructed that if you believe from the evidence that the defendant took said animal in question, in the belief in good faith that same was his own animal, then you will acquit the defendant, although

you may determine the animal did not belong to defendant.

" 'If upon this point you have a reasonable doubt, you will give the defendant the benefit of same and acquit the defendant, and say by your verdict not guilty.'

"This charge was refused. No similar charge either in substance or verbiage was given in the main charge. We are of opinion that appellant was entitled to have this theory of the case appropriately presented to the jury. Manifestly, if the jury believe he butchered the animal in good faith, believing it to be his, he would not be guilty of theft."

Still another case involving the charge of stealing calves is that of Peterson v. People, 65 Colorado. 106, 173 Pac. 876. There the jury was told:

"You are instructed that if you find and believe from the evidence beyond a reasonable doubt that the said defendant, on the 18th day of April, 1915, at the said county of Lincoln, did then and there willfully, unlawfully and feloniously of the personal goods and chattels of Richard Lee, three head of neat cattle steal, take, and drive away with intent then and there to steal the same and deprive the owner of the immediate possession thereof,"

Yet the court said:

"It is further objected that the court refused to give tendered instructions that, if the jury had ' a reasonable doubt on the question of whether the defendant did or did not honestly consider these animals his own property when he took possession of them', it was their duty to acquit him. This instruction should have been given".

The case of Linde v. State, supra, was one where the defendant was convicted of the crime of stealing turkeys. Reversing a judgment of conviction, this was said:

"It was the contention of the defendant that his taking of the turkeys was in good faith, believing at the time

they were his. He offered a requested written instruction, asking the court to inform the jury that if at the time of the taking of the property by the defendant he in good faith believed said property was his or if they had reasonable doubt to that effect, they should acquit him. This although he may have been mistaken in such belief.

"The court refused to give this instruction and we think this was error. It is the duty of the court, in his instructions, to present to the jury the theory of the defense when requested by the defendant. This court has often held this to be true." (Citing cases)

In Stanley v. State, 61 Okla. Cr. R. 382, 69 Pac. 2d 398, a later case from the same jurisdiction, the defendant was convicted under an information charging him with the larceny of a number of hogs. The only question the court considered was whether the evidence in the record was sufficient to sustain the charge. The propriety of the instructions in the case does not seem to have been involved. However, the disposition of the cause was made to turn upon whether the evidence disclosed the existence of a criminal intent on the part of the defendant in taking the animals in question. After a careful review of both the evidence submitted and authorities from other jurisdictions as well as its own prior decisions on the point, including Linde v. State supra, the appellate court reversed the judgment of conviction saying in part:

"The defendant in his testimony states positively he had a right to butcher the hogs, and that he did not butcher any of the prosecuting witness' hogs to his knowledge. All of the testimony goes to the fact that the defendant either butchered his own hogs or believed he was butchering his own hogs, and if they belonged to Alvie Cunningham, the defendant was honestly mistaken. * * * The court is of the opinion that the testimony is insufficient to sustain a conviction of the offense charged against the defendant, as it appears from the undisputed testimony that the defendant got the hogs at his neighbors who had penned them for

him, and another neighbor had helped load the hogs; he took them home in his car in the daytime and in the presence of his neighbors in the community butchered them within a few feet of the public highway. The defendant stated positively that he got these hogs from Mrs. Cora Dameron, and she corroborated the defendant.

"It has been held universally by the courts, not only in this state but in other states, that, where the taking is open and in the presence of friends, and there is no subsequent attempt to conceal the property, and no denial, and where possession is not obtained by force, trickery, or stratagem, a strict presumption of fact arises that there was no felonious intent which must be repelled by clear and convincing evidence before a jury may legitimately infer a felonious intent.

"The evidence in this case is wholly insufficient to show the necessary elements of the offense charged. We therefor do not hesitate to say the judgment of conviction should be reversed."

Another alleged hog-stealing case is that of Griffin v. State 87 Tex. Cr. R. 194, 220 S. W. 330. The defendant was convicted of this theft. The following excerpt from the opinion sufficiently discloses the evidence before the court on review, the question presented upon the special instruction asked in behalf of the defendant and the conclusion of that court thereon:

"It appears from the testimony that appellant had a number of hogs on the range, and that he claimed to have been giving the same marks found in the ears of the alleged stolen hogs; said marks having been given for his son, according to his statement, for about two years. When the searching party went to his premises on the occasion in question, they told him they had a search warrant, and he replied that they did not need any, and escorted them to his smokehouse, and told them to examine the hogs. The ears of the hogs hanging in the smokehouse were intact, and no attempt had been made to disguise or change the marks. Mr. Knight, the alleged owner, after testifying that he

identified two of said hogs as his, stated on cross-examination as follows:

" 'This negro said they were his hogs. He claimed them as his. * * * He made no objection to my examining them, and he claimed them as his—claiming them for his hogs. He claimed the hogs as his boy's.'

"Further, the witness Knight testified to having a civil suit with appellant over the possession of the hogs thereafter; that he claimed them, and appellant claimed them. In this condition of the record, it appears beyond question that appellant was entitled to have the jury instructed substantially that if he took said hogs, believing in good faith that they belonged to him, or to his boy, he would not be guilty of the theft.

"The main charge of the trial court was excepted to by appellant, because of the failure to instruct the jury that if defendant took said hog under an honest claim of right, and believing it to be his property, even though mistaken, he would not be guilty of theft; and the following special charge was asked by appellant:

" 'Although the jury may believe from the evidence that the hog belonged to Knight, yet if the jury believe (or have a reasonable doubt in the matter) that defendant took the hog, believing honestly at the time of the taking that it was his hog, then the essential element of fraudulent intent would be lacking, and the defendant should be acquitted.'

"An examination of the charge of the court discloses that no affirmative presentation of this defensive theory appears therein, said charge merely following the usual form for such theft. In our opinion, such charge, or one embodying this defense, should have been given. The question of whether such taking was in fact under an honest claim or right is one for the jury.

\* \* \*

"For the error mentioned, the judgment of the trial court will be reversed, and the cause remanded."

State v. Collins, 292 Missouri 102, 237 S. W. 516 was a case where the defendant was charged by informa-

tion with the larceny of a cow, was convicted and brought the record up for review by appeal. Discussing the instructions given and refused therein, holding the instruction given insufficient and that the judgment of conviction should be reversed because of the refusal to give the requested charge, this was said:

"Appellant, at the trial below, objected to the state's instruction numbered 1, and asked the court to instruct the jury as to defendant's honesty, good faith, and lack of criminal intent, in dealing with the cow in controversy. This request was refused, and no instruction given in behalf of defendant in respect to this matter. Instruction 1, supra, given in behalf of the state, reads as follows:

" 'First. If, upon consideration of all the testimony in the case, in the light of the court's instructions, you find and believe from the evidence that at the county of Pemiscot and state of Missouri, on or about the —— day of July, 1920, or at any time within three years next before the filing of the information herein, the defendant did wrongfully take and carry away one cow with intent to fraudulently convert the same to his own use and permanently deprive the owner thereof without his consent, and the same was the property of Charlie Ward, and of the value of $30 or more, you will find the defendant guilty of grand larceny, and assess his punishment at imprisonment in the penitentiary not less than two years nor more than five years, and, unless you so believe and find from the evidence, you will acquit the defendant of grand larceny.'

"This instruction might be sufficient under some circumstances, where the *facts* warranted the giving of same, but in *its present form it utterly ignored appellant's main defense in the case.* The defendant testified that his father gave him a red heifer two years before the trial, which strayed from the range, and that he believed the cow in controversy which he took from Williams and sold to Sanders was the same animal his father had given him two years before. The defendant's testimony, supra, was corroborated by that of his

father and Fewell. The father testified that he had given the defendant a red heifer two years before, which strayed away about two years before the trial; that appellant had offered to pay him to assist in locating said animal. The defendant likewise testified that he had no intention of stealing the cow in question from anybody, and believed it was his cow. As said, instruction 1 ignored the defense aforesaid. It did not properly declare the law of the case.

"We hold that in a case of this character, where the defendant claims byhis evidence, he acquired possession of the property in controversy under an honest belief that it belongs to him, and that he had no intention of stealing the same, the trial court, if requested, should give an appropriate instruction covering this branch of the case."

It is significant that the use of italicized language for emphasis given as set forth in the quoted language above is that of the appellate court.

See also Ludlum v. State, 13 Alabama App. 278, 69 So. 255; 36 C. J. 931 § 549.

The foregoing authorities would seem to clearly establish that the defendant's requested instruction lettered "A", aforesaid, or one similar to it should have been given by the District Court and that it was prejudicial error to refuse it. We think the defendant had a right to have his main defense in the case affirmatively presented to the jury. He claimed prior to the trial, during its course, and still does, that he owned the sheep in question. There was substantial evidence which, if the jury believed it, would support his contention. These sheep when released by Mrs. Butler ran after Hickenbottom's sheep which had been driven away shortly before but the noise of their bleating was still audible. Hickenbottom found them with his own sheep the next morning near the line fence between the two ranch properties, his and Mrs. Butler's. According to his testimony, there were traces of the marks

he had placed upon them when he bought them from Twiford and Evey; both the men last mentioned testified that these sheep were in the bunch they had previously sold to Hickenbottom and gave their reasons for so concluding, as we have been. There was no subsequent attempt on Hickenbottom's part after he discovered these ten sheep in his own band to conceal these animals; they were allowed to graze near his house and Mrs. Butler saw some of them there on the 5th of July without appellant's marks thereon. At the time Hickenbottom placed his marks upon these animals he knew that Branson and Mrs. Butler knew he had some of them for Branson came over to Hickenbottom's residence to get them that morning. Hickenbottom never denied that he had these sheep. He did not obtain the possession of the animals by force, trickery or strategem. He went with and aided the sheriff of Crook County in gathering them for inspection. In this connection that officer was asked and answered thus, these questions on cross examination:

"Q. Now then, you went down to the Hickenbottom place after that?

"A. I did.

"Q. Did you see Mr. Hickenbottom?

"A. I did.

"Q. Did he make any objection to your looking through his sheep?

"A. No, he didn't.

"Q. Did he cooperate with you in every way?

"A. Yes, he did.

"Q. He didn't try to conceal anything from you, did he?

"A. No, he didn't.

"Q. And when some reference was made to these sheep that are involved in this matter, or any of them, did Mr. Hickenbottom call your attention to the earmarks on these sheep?

"A. Yes, he did.

"Q. Did he compare these earmarks with other sheep around?

"A. Yes, he did.

It may be properly noted that the facts recited in the paragraph just preceding for the most part stand in the record undisputed. Other facts pertinent on the same point have heretofore been detailed. Indeed, these facts are of such a character that we are inclined under the authorities reviewed above to say that we have some doubt as to the sufficiency of the evidence as the record now stands to justify conviction of the defendant herein. The legal ownership of the sheep would appear to be the main question presented, a question simply of civil liability only.

The judgment of the District Court of Crook County should be reversed and a new trial granted and an appropriate order to that effect will be made.

*Reversed.*

KIMBALL, J., and BLUME, J., concur.