[Crim. No. 7077.   In Bank.   June 4, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. RICHARD MILLER, Defendant and Appellant.

822

Grant B. Cooper, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk, Attorney General, and William E. James, Assistant Attorney General, for Plaintiff and Respondent.

DOOLING, J.—Defendant was convicted of first degree murder and the penalty was fixed at life imprisonment. A motion for a new trial was denied. He has appealed from the judgment and the order denying his motion for a new trial.

On the night of December 2, 1960, defendant and Charley Harper, a friend, were visiting at a neighbor's home. After spending some two or three hours there, during which time there was some drinking and gambling, defendant and Harper left. They walked down the street toward a liquor store. Harper testified that he noticed a girl at the corner of a building across the street from the store. Harper went into the store to buy some cigarettes and left defendant crossing the street. As Harper came out of the store, he saw defendant grab the girl and "push her behind the wall." Harper stood in front of the store a few minutes, then walked down the street, "passed by" and "looked behind the wall" but "didn't see [any] more"; so he continued a little further down the street, came back and looked and saw no one, and returned to the liquor store and stood there. In a few minutes defendant came out from behind the wall; no one was with him. As defendant started walking down the street, Harper caught up with him and asked defendant, "How you come out, Buddy?" Defendant replied, "You haven't seen me." Harper then went off to visit another friend and defendant continued walking down the street. The next day upon learning that the girl had been killed, Harper went to the police.

The police found the deceased's body behind a walk-in icebox located on a lot next to the building where Harper had seen defendant with the girl. Her clothes were disarrayed and torn; her skirt was up above her mid-section; her blouse was ripped open and her brassiere was torn off; she had no panties on or other garments; her shoes were off and lying on the ground. She had blood about her hip and her head looked as though it had been beaten. There were blood splatters on the cement walkway close to the body and marks on the ground as though the body had been dragged around to the rear of the icebox. A janitor at a nearby dance hall found the girl's purse in the street early the next morning; he was briefly questioned by the police but not detained.

A lady whose house was at the rear of the lot where the body was found testified that about 11 or 11:15 p. m. on the night in question she heard someone moving outside her bedroom window; that there then followed a faint call of a woman for help, a man's command to "hush" and again a woman's call for help. As she thereafter listened, she heard a "fast, unusual moving around," like "a scuffling," a "drop of a balloon and [it] busted," as though "something was popping . . . it was moving around so fast."

The cause of death was a contre-coup injury to the brain from a blow on the left side of the head, with multiple fractures of the skull; on the right cheek there were curved brush abrasions and roughened torn surfaces, which might have been caused by a blow inflicted by an object with a broad, rough surface; and on the left side of the head there was a similar wound over a depressed fracture of the skull. On the ground near the body was a large piece of wood resembling part of a railroad tie with rough, unfinished surfaces, and a large boulder embedded in the ground. Nearby was a wall composed of cinder blocks. The autopsy surgeon testified that the injuries to the head could have been caused by the head striking against the boulder, the rough piece of wood or any one of the blocks in the wall.

The deceased was 19 years old. On the night in question she had been at a night club with her brother and had left about 11 p. m. There was no physical evidence that the girl had been raped. The autopsy surgeon testified that he found no sperm cells and no evidence of injuries or blood in the vaginal area. He could not say whether or not sexual intercourse had been completed on the girl shortly before her death.

Upon learning that the police were looking for him, defendant surrendered on the next day, December 3. In vital particulars, his story differs from the People's case. His first statement to the police was little more than a brief admission of his encounter with the girl in the vicinity in question; that when he saw her she made "a pass at him" but he did not touch or lay his hands on her; and that he went on home to his wife. Later that night defendant voluntarily gave a second statement which he signed. In this he stated that he and Harper on the night in question left a gambling game at their friend's home about 12 midnight; that they walked down the street together and Harper turned into a liquor store. Defendant then proceeded to a little club where he saw the girl and "some guy standing back by the wall." She asked him if he "wanted to have a good time" but he rebuffed her advance. Then the man mumbled something and grabbed defendant by his arm; and defendant grabbed the girl and "slung her into him." Defendant had his arm about the man's neck, the girl advanced toward defendant, and in the struggle defendant hit her with his fist, tore her blouse, and she fell. Then defendant threw down the man and picking up a bottle, hit the man across the back or neck. The man scrambled to his feet and ran. Defendant left the girl lying

on the ground and walked down the street where he came across Harper again. Harper asked defendant for a dollar, defendant refused, and they separated—with defendant taking the bus home. At the trial defendant, in explanation of the differences between his two accounts as to the circumstances of his encounter with the girl, stated that he was afraid to tell the truth at first because he did not want "to be involved with a homicide" but that he later decided he would be better off telling the truth.

The crucial portions of defendant's testimony at the trial, after he had testified to being accosted by the girl are here quoted: "There was a fellow standing against the wall here. . . . He grabbed my left arm. When he grabbed me, I put my arm around the girl and flung her into the fellow and we started to fight.

"Now she came toward me and I wrenched at her and tore her blouse and hit her with my left hand or first [sic, evidently fist].

"During that time I had the fellow around the neck with my right arm. When I let go I hit him and he was down on the ground, and I picked up something, I don't know if it was a bottle or what it was, and I hit him . . . across the back or neck area. He rolled over and got up and ran. When I left I noticed the girl was lying down. I walked around the corner. . . ."

Before he left he "caught a glimpse of the girl"; she was "laying on the ground." He didn't take time to notice her further than that "she was in a prone position."

It is the People's theory that the verdict of murder in the first degree is supported by the circumstantial evidence from which the jury was entitled to draw the inference that the homicide was committed in the perpetration of, or attempt to perpetrate, rape upon the victim. Defendant cites *People* v. *Craig*, 49 Cal.2d 313 [316 P.2d 947], in support of the contention that the circumstances here in evidence are not sufficient to support an inference of rape or attempted rape; and accordingly, as in *Craig*, the homicide could at most be murder in the second degree. (*People* v. *Craig*, *supra*, 49 Cal.2d, pp. 318-319.) While on their facts there are many similarities between the *Craig* case and the one which is now before us, there are also significant differences. In *Craig* no witness saw the actual encounter between the defendant and his victim, while in the case before us the witness Harper testified that he saw defendant grab the girl and pull her behind the wall.

Also, unlike *Craig*, a witness heard part of the encounter between the victim and her assailant; a woman's voice calling faintly for help, a man's voice saying "hush," and a fast, unusual moving around. Of special significance is the fact that in *Craig* while the defendant's clothes were elsewhere covered with blood, there was "no blood on defendant's trousers, other than at the cuff, and no blood on either the fly of his levis or shorts." (49 Cal.2d, p. 318.) The court in *Craig* relied greatly on this factor, as the following quotation shows: "Since other articles of defendant's wearing apparel were well spattered with blood and his hands covered therewith, it would appear that had he raped the deceased, or attempted to do so, the levis and shorts would have shown signs of blood." (49 Cal.2d, p. 318.) There is no similar circumstantial evidence pointing affirmatively to the absence of rape or attempted rape in the case before us. The *Craig* case was a close one on its facts, as evidenced by the dissent of three members of the court; and it is our opinion that there are sufficiently significant differences in the circumstances of the two cases to justify the conclusion that the *Craig* case is not controlling on the question of the sufficiency of the evidence in the case before us to support the inference, if the jury was persuaded to draw it, that the homicide was committed in perpetrating, or attempting to perpetrate, rape. (See *People* v. *Cheary,* 48 Cal.2d 301, 310 [309 P.2d 431].)

The *Craig* case does point up, however, the fact that ours is a close case on the question of whether rape or attempted rape was in fact circumstantially proved, and that the jury might well have found that while defendant committed the homicide, it was not proved beyond a reasonable doubt that he did so in the commission of, or attempt to commit, rape. If the jury so found, under the holding of the *Craig* case the homicide would be at most murder in the second, and not in the first, degree. (*People* v. *Craig, supra,* 49 Cal.2d, p. 319.) In the light of this the gravity of the errors in the giving and refusal of instructions about to be discussed is markedly increased.

The court at the request of the People gave the following instructions:

"Murder is the unlawful killing of a human being with malice aforethought.

"Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when

no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

"Malice aforethought, either express or implied, is manifested by the doing of an unlawful and felonious act intentionally, deliberately, and without legal cause or excuse. It does not imply a pre-existing hatred or enmity toward the individual injured."

"Murder is classified into two degrees, and if you should find the defendant guilty of murder, it will be your duty to determine and state in your verdict whether you find the murder to be of the first or second degree."

■ Having so instructed the jury that it was its duty if it found defendant guilty of murder to determine the degree, the court also at the request of the People flatly and inconsistently instructed the jury: "Although there are two degrees of murder, the evidence in this case is such that either the defendant is innocent of the charge of murder or he is guilty of murder in the first degree." The court erred in giving this latter instruction because it left the jury with no alternative in fixing his guilt, if it found him guilty of a homicide at all, except to find him guilty of first degree murder. Manifestly such instruction completely ignored the issue of self-defense raised by defendant and took from the jury the alternatives of second degree murder and manslaughter, either of which verdicts would find support in the evidence. Even if the jury gave some credence to defendant's testimony, it might still have found him guilty of manslaughter. (*People* v. *Best,* 13 Cal.App.2d 606, 609-610 [57 P.2d 168].)

■ The court properly instructed the jury at the People's request on rape, attempted rape, and homicide resulting from rape or attempted rape, and that such a homicide is murder of the first degree. From this the People argue that unless the jury found that the homicide was committed in the commission of, or attempt to commit, rape the jury would have acquitted defendant, and for this reason he suffered no prejudice. This argument ignores the instruction on murder quoted above under which the jury could have found defendant guilty of murder even if it failed to find that defendant raped or attempted to rape the girl, in which event the murder would, however, have been in the second degree. It also ignores the fact that defendant was entitled to have the jury properly instructed on the issues of self-defense and the lesser

degrees of homicide so that it could fairly appraise the legal effect of defendant's version of what had occurred in the light of proper instructions on the applicable legal theories. This is not, as the People argue, a case where the evidence "overwhelmingly" pointed to a murder in the first degree and there could be no reasonable doubt as to the accompanying felony charge (here rape) so as to exclude all question of any lesser offense (e.g., *People* v. *Turville,* 51 Cal.2d 620, 632 [335 P.2d 678] ; *People* v. *Riser,* 47 Cal.2d 566, 581 [305 P.2d 1] ; *People* v. *Rupp,* 41 Cal.2d 371, 382 [260 P.2d 1] ; *People* v. *Sanford,* 33 Cal.2d 590, 595 [203 P.2d 534] ; *People* v. *Alcalde,* 24 Cal.2d 177, 188 [148 P.2d 627] ; *People* v. *Perkins,* 8 Cal.2d 502, 516 [66 P.2d 631] ; *People* v. *Johnson,* 219 Cal. 72, 76 [25 P.2d 408]—all cited by the People).

Defendant requested and the court refused to give his instructions on murder in the second degree; on lesser included offenses; involuntary manslaughter; voluntary manslaughter; murder and manslaughter distinguished; manslaughter, voluntary and involuntary, defined; and lesser offense, murder or manslaughter. The court also refused to give defendant's requested instruction on "self-defense against assault," which was the prime support of his defense to the murder charge. Defendant's testimony, if believed, would support the finding that he acted in self-defense, and where there is evidence which tends to show that the defendant acted in self-defense, the court must instruct the jury on the law of self-defense applicable to the evidence. (*People* v. *Holt,* 25 Cal. 2d 59, 64-65 [153 P.2d 21].)

In *People* v. *Carmen,* 36 Cal.2d 768 [228 P.2d 281] at page 773, it is said: ". . . a defendant is entitled to instructions on his theory of the case as disclosed by the evidence, no matter how weak. As so ably stated in *People* v. *Burns,* 88 Cal.App.2d 867, 871 [200 P.2d 134], with ample citation of authority: 'It is *elementary* that the court should instruct the jury upon every material question upon which there *is any evidence deserving of any consideration whatever.* [Citing cases.] *The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon.* [Citing cases.] *That is a question within the exclusive province of the jury. However incredible the testimony of a defendant may be he is entitled to an instruction based upon the hypothesis that it is entirely true.* [Citing cases.] It is the duty of the court to instruct the jury in regard to any included offense which the

evidence tends to prove. [Citing cases.] ▮▮ In *People* v. *Carroll, supra* [20 Cal.App. 41 (128 P. 4)], the court said (p. 45): "It is undoubtedly the rule that, where there is *any* evidence from which a reasonable inference may be drawn that the crime of which the defendant was convicted was of a lesser degree . . . it is prejudicial error to withdraw from the jury the consideration of such evidence and confine the instructions to the crime [charged]." ' ▮▮ . . . It has been repeatedly held that it is reversible error to refuse a manslaughter instruction in a case where murder is charged, and the evidence would warrant a conviction of manslaughter. [Citing cases.]" (See also *People* v. *Lewis,* 186 Cal.App.2d 585, 596-599 [9 Cal.Rptr. 263].)

▮▮ Even under the incomplete, faulty and misleading instructions which the jury received, under which the defendant was deprived of every legal defense which his testimony would have supported, the jury must have had serious doubts of defendant's guilt. The case was submitted to the jury at 10:19 a. m. At 4 p. m. the jury returned to the courtroom for the reading of a portion of the evidence, and only after that brought in its verdict at 4:45 p. m. The fact that the same jury brought in a life-sentence verdict in a case which, if it believed the People's theory of homicide in an attempt to commit rape, involved a particularly brutal and abhorrent murder lends color to the possibility that the jury may have placed some credence in defendant's testimony and yet felt compelled under the faulty instructions given it to find defendant guilty of murder in the first degree. The errors in the giving and refusal of the instructions above discussed must, on the facts of this case, be held to have been prejudicial.

Defendant also complains of the court's failure to instruct on the matter of intoxication. The court instructed the jury that both a killing in the perpetration of, or attempt to perpetrate, rape and an assault with intent to commit rape required specific intent; and defendant contends that to complete the jury's consideration of this question of intent, his requested instruction on intoxication should have been given in line with his testimony. Defendant did not testify that he was "drunk" or "intoxicated" but only that he was "under the influence of alcohol" at the time in question. Harper and defendant both testified that defendant had had but "one drink" at the friend's house before they left.

▮▮ The mere fact that a defendant may have been drinking prior to the commission of a crime does not establish

intoxication or require the giving of a requested instruction thereon. (*People* v. *Turville, supra,* 51 Cal.2d 620, 633; *People* v. *Price,* 207 Cal. 131, 133 [277 P. 316].) The cases of *People* v. *Baker,* 42 Cal.2d 550, 573 [268 P.2d 705]; *People* v. *Sanchez,* 35 Cal.2d 522, 527-529 [219 P.2d 9]; and *People* v. *Coyne,* 92 Cal.App.2d 413, 415-417 [206 P.2d 1099], are not analogous because in each both the testimony and defense offered was clearly one of intoxication.

Defendant refers to the definition of "Intoxicated" in Webster's New International Dictionary, Second Edition, as "under the influence of an intoxicating liquor or drug . . . Syn. See Drunk." Defendant insisted quite pointedly in his testimony that he was "not drunk" though he "was influenced by alcohol"; and it seems clear from the transcript that defendant was not relying on the issue of intoxication as a defense, and that the testimony which he gave on the subject did not require the question of intoxication to be submitted to the jury in the instructions. Defendant testified that it was only *after* his encounter with the girl that he got "pretty loaded"—for upon leaving the scene of the homicide, he stopped at a liquor store, where he bought a bottle of whiskey, and drank it on the way home.

The judgment and the order denying a motion for a new trial are reversed.

Gibson, C. J., Traynor, J., Peters, J., and White, J., concurred.

SCHAUER, J., Dissenting.—The issues in this case are primarily—and as I view the record and the law, controllingly—factual. The errors found by the majority thus either are not errors at all in any present circumstance or, on acceptance of the traditional disparity of functions of the trial court on the one hand and the reviewing court on the other, are immaterial.

The majority hold that it was inconsistent and erroneous to instruct the jury that (a) "Murder is classified into two degrees, and if you should find the defendant guilty of murder, it will be your duty to determine and state in your verdict whether you find the murder to be of the first or second degree" and (b) (Form 302-B CALJIC) "Although there are two degrees of murder, the evidence in this case is such that either the defendant is innocent of the charge of murder or he is guilty of murder in the first degree." I find neither inconsistency nor error in so instructing the jury.

At a trial (by jury) on the issues joined by the plea of not guilty to a charge of murder (assuming the evidence is sufficient to go to the jury at all) the law requires that the jury determine the issue of degree as well as identity of offense. Unless the defendant, in person, joined by his counsel and the prosecutor, stipulates to waive trial by jury the issue of degree must remain with the jury. It is code law that "Whenever a defendant is convicted of a crime which is distinguished into degrees, the jury, or the court if a jury trial is waived, must find the degree of the crime of which he is guilty. Upon the failure of the jury or the court to so determine, the degree of the crime of which the defendant is guilty, shall be deemed to be of the lesser degree." (Pen. Code, § 1157.)

Furthermore, it is likewise elementary that in a criminal trial by jury the court cannot require the jury to bring in a directed verdict. Indeed the most that the judge can do in this respect is to "advise the jury to acquit the defendant. But the jury are not bound by the advice." (Pen. Code, § 1118.) The judge may also comment on the evidence. (Cal. Const., art. VI, § 19.) It was, therefore, not "inconsistent" to instruct the jury as to their duty as above related, if the evidence so required. As the court viewed the evidence—and I think the trial judge had every right to so view it—the instruction was not only not inconsistent, it was proper. It was consistent with the theory on which the case was tried and accords with a long-recognized practice. (See e.g., *People* v. *Davis* (1957) 48 Cal.2d 241, 250 [10] [309 P.2d 1].) If the defendant had acted only in justified self-defense, as he claimed in one of his inconsistent stories, he was entitled to an acquittal, not a manslaughter verdict. If his story was not true he was guilty of first degree murder. The trial judge was eminently fair in the instructions he gave; indeed if he erred at all it would seem (when all of the instructions given are read together)[1] that he erred in favor of the defendant.

Furthermore, inasmuch as the issues here (i.e., whether there was error at all and if so whether it resulted in a miscarriage of justice) are primarily factual, this court is in a very weak position to review the findings of the jury and those of the trial judge. As the United States Supreme Court recently said (in a case wherein the rule does not apply with so much force as it does here): "But the Examiner—the one whose appraisal of the testimony was discredited by the Court

---

[1]By no means all of the instructions relevant to this issue are included in the majority opinion.

of Appeals in *Florida Citrus Canners Cooperative* case—sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records. As we said in the *Universal Camera* case:

" '. . . The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case.' 340 U.S. [474], at 496 [71 S.Ct. 456, 95 L.Ed. 456].

*"For the demeanor of a witness*

" '. . . *may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story*; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies.' *Dyer* v. *MacDougall,* 201 F.2d 265, 269." (Italics added.) (*National Labor Relations Board* v. *Walton Mfg. Co.* (1962) 369 U.S. 404 [82 S.Ct. 853, 855 [3-4], 7 L.Ed.2d 829] ; see also *Estate of Bristol* (1943) 23 Cal.2d 221, 223-224 [2, 3] [143 P.2d 689].)

The trial judge is presumed to have exercised his independent judgment on the weight as well as the sufficiency of the evidence in denying the motion for new trial. Certainly the evidence is not insufficient as a matter of law to support the judgment or the court's rulings and I find no adequate basis for concluding here that any error has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 4½; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [12] [299 P.2d 243].)

For all of the reasons stated I would affirm the judgment and the order denying the motion for new trial.

McComb, J., concurred.