[Crim. No. 9139. Second Dist., Div. Two. Nov. 24, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. RICHARD DAVIS MILLER, Defendant and Appellant.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

Richard Davis Miller, in pro. per., and Wardell Moss, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch and Stanley Mosk, Attorneys General, William E. James, Assistant Attorney General and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

KINCAID, J. pro tem.*—Appellant was charged with murder committed on December 2, 1960. Following a jury trial he was convicted of first degree murder and the penalty was fixed at life imprisonment. An appeal from that judgment was considered by the California Supreme Court and the judgment was reversed (*People* v. *Miller,* 57 Cal.2d 821 [22 Cal.Rptr. 465, 372 P.2d 297]). The reversal was basically because of error in the instructions to the jury.

The facts on the previous appeal and those presented on this appeal are substantially the same. The information alleges appellant suffered a prior felony conviction in the State of Michigan in 1954 for the crime of robbery. When arraigned at this trial, appellant admitted this prior felony conviction. A jury again returned a verdict of first degree murder. Penalty was again fixed at imprisonment in the state prison for life. The prior felony conviction was found to be true. Following denial of motion for new trial probation was denied and appellant was sentenced to the state prison for life. The appeal from this judgment followed.

Appellant filed a brief in propria persona and following

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

appointment of counsel for appellant an additional brief was filed.

Appellant concedes that the facts presented on this appeal are substantially those as presented on his former appeal. He contends that these facts are insufficient as a matter of law to sustain the conviction.

## STATEMENT OF THE EVIDENCE

The principal witness for the prosecution, Charles Harper, was in the company of appellant on the night of December 2, 1960. The victim of the alleged murder, Jossie Perkins, was last seen alive about 11 o'clock on the night of December 2. She was seen leaving a nightclub near the intersection of 92nd and Beach Streets. This intersection is adjacent to the area in which her body was found the following day.

The prosecution witness, Harper, and appellant were walking toward the intersection of 92nd Street and Beach Street, shortly before 11 o'clock the night of December 2, 1960. Harper entered a liquor store at that intersection to buy cigarettes. As he did so, he observed the appellant walk across the street. Harper then observed that a girl was standing on the corner across the street and saw appellant cross over to her. Harper next saw appellant grab the girl with both his hands and push her behind the corner building. Just as he did so Harper heard the girl twice call out "Ow! Ow!"

After purchasing cigarettes, Harper walked across the intersection to the building and stood on the corner a moment at the place where he had seen appellant push the girl behind the building. There was an open yard there and an icehouse. The area was familiar to Harper but he was unable to see either appellant or the girl. Furthermore, he was unable to hear anything. Harper then observed two men coming from the dance hall. They were coming toward him and after they passed him Harper walked in the opposite direction. After walking a short distance he returned to the liquor store, stopped and stood in front of it. This was the same liquor store where he had purchased the cigarettes. As Harper looked across the street he saw the appellant come from behind the building where he had previously disappeared and walk down the street in a southerly direction. Harper then started down the same street on the opposite side. He then walked across the street, crossing to where appellant was. Harper said to appellant, "How did you come out, Buddy?" Appellant replied, "You ain't seen me." Harper then walked on to the home of Mrs. Ernestine Perry where he remained the

rest of the night. When Harper learned that the victim had been found dead behind the icehouse in the yard on the following day, he went to the police.

Ernestine Perry testified that Harper came to her house between 11:30 and midnight on the night of December 2, and related to her the incident that he had just observed at 92nd and Beach Streets. Harper then remained in her home for the rest of the night and left the following morning.

Harper lived in a boarding house operated by a Mrs. Armour Young. Mrs. Young testified that Harper returned to her boarding house about 7:30 the morning of December 3. He then related to Mrs. Young that he had walked to 92nd and Beach Streets with appellant; that Harper had then purchased a package of cigarettes; that then he saw the appellant grab a girl and go behind a building with her. Harper then waited for the appellant but appellant did not come out. Harper then followed the appellant but was unable to see him. Harper waited in front of the liquor store until appellant came from behind the building, then asked appellant how he came out and appellant told Harper, "You haven't seen me."

Dolly Mae Carter, who lives on 92nd Street in a home adjacent to the yard with her bedroom that has windows opening onto a wall immediately in back of the icehouse, testified that she was in her bedroom on the night of December 2 at around the hour of 11:15. She heard a walking around outside her window. A woman called "Help" twice and a man said "Hush." She heard walking in the direction of the icehouse. She also heard an awful noise, something like a bladder bursting and air coming out of it. She testified that it was the worst noise that she had ever heard and it came from behind the icehouse. The noise continued for from three to five minutes. She became frightened and walked from her bedroom through her rooms into a business establishment in the front of her building where her husband was still working.

The deceased, Jossie Perkins, was an unmarried girl, 19 years old, who came from Mississippi seven months before her death and was living in Los Angeles with her aunt.

On the morning of December 3, the body of the deceased was found in back of the icehouse, lying with the legs spread and the dress above the bare breasts so that the body was fully exposed. The crotch was torn out of her undergarment. There were drag marks from a point where a torn purse was found to the rear of the icehouse. The head of the deceased was lying near a piece of railroad tie and also near a boulder and

a concrete block. The cause of death was multiple contusions and fractures of the skull. There were deep lacerations through the scalp. Death had been caused by the head striking a solid stationary object. Death resulting from brain damage could have been caused either by the head striking the railroad tie, the rock or the concrete block. The wounds, however, were so severe they could not have been caused from the girl's body merely falling.

After her death an examination was made of her vaginal wall. Her hymen was not intact but no sperm cells were present and the examiner was unable to say whether any recent intercourse had taken place.

The appellant surrendered himself to the police at the 77th Street Station. He asked whether he was wanted for murder. He stated that he had never murdered anyone. He said he hadn't seen any girl on 92nd Street. Later he changed his story and said that he did talk to a girl but didn't touch her. Appellant then changed his story again. Appellant then stated to the police that when he crossed the street, the girl standing on the corner asked him if he wanted a good time; that appellant told her that if he wanted a good time he would go home. That then some man grabbed him by the arm; that appellant then threw the girl into the man; that appellant then grabbed the man around the head; that the girl came toward appellant so appellant struck the girl with his fist and she fell down. Appellant threw the man down. Appellant then picked up something from the ground which he thought was a bottle and hit the man across the back of the neck. The man rolled over, jumped up and ran. When appellant left the corner, the girl was lying on the ground. After he walked away from the corner he saw Harper who asked him for a dollar which appellant refused. Appellant then took the bus and went home.

He described the clothes that he had been wearing on the night of December 2 and police went out to appellant's residence and recovered the clothing he had described. His clothes had been freshly washed and were still wet.

A criminalist examined the appellant's clothing and although they had been washed, he observed what appeared to be blood stains and he found that one of the stains on appellant's trousers still gave a positive reaction. The rest of the stains were negative when examined by the benzidine test.

Appellant's sister testified for the defense that she informed appellant that the police were looking for him. He was living

with a girl by the name of Thelma Le Noir. This woman testified that the appellant came home on the night of December 2 in an intoxicated condition and continued to wear the same clothing throughout the night and the following day. On December 3, 1960, appellant took a bath and changed his clothes before going to the police station. He dropped the clothes that he had been wearing into the bath water and told her to wash them out. She did not observe any particular spots on the clothes. This was the clothing that had been recovered by the police.

Appellant took the stand in his own defense and testified that on the night of December 2, 1960, when he crossed the street, a girl standing at the corner spoke to him and asked him if he wanted a nice time. He replied that if that was what he wanted he would go home. That a man then reached out and grabbed him; that he then feared that he was going to be robbed. He threw the girl into the man and as he did so he grabbed the man around the neck. The girl attempted to aid the man so appellant grabbed at the girl and tore her blouse. Appellant then let go of the girl and hit her with his fist. Appellant said that at that time he was holding the man with his right hand, therefore, he struck the girl with his left hand and she fell down. The man was clutching appellant's right hand from a kneeling position. The man was also holding appellant's leg. Appellant then stepped on something. He didn't know whether it was a brick or a bottle but he picked it up and hit the man over the back of the neck. The man rolled over and ran from the area. Appellant then dropped the object with which he had hit the man. He did not hit the girl any more nor did he hit her with that object; he merely hit her once with his left fist. This struggle was only approximately six feet from the sidewalk and not back twenty or thirty feet into the yard or near the icehouse. The girl was lying on the ground when he last saw her and he didn't notice whether she appeared to be hurt.

Appellant testified that after leaving the corner he saw the prosecution witness, Harper. That he had a conversation with Harper. Appellant denied saying, "You ain't seen me." He also denied that Harper asked him how he made out. Appellant stated that Harper asked to borrow a dollar and appellant refused. Appellant then stated that after leaving Harper he circled a block. He met an acquaintance and together they bought a bottle of wine. Appellant then went to his home where he fell asleep fully dressed. He continued to wear the same clothes until he was ready to take a bath. This

was just before going down to the police station. He threw his clothes into the bathtub and asked Thelma, the woman with whom he was living, to wash them out for him. He then drove down to the police station in his sister's car. When he was asked by the police if he knew anything about a homicide, he denied any knowledge of it. When asked if he had seen a girl, he denied having done so. He gave the reason for his denial that he did not have a lawyer to represent him. Appellant stated that it was his intention to continue to lie to the police until he found out the nature of the trouble he was in. When appellant was told that the police had a witness who saw him grab or push a girl, he then told the police that he had thrown a girl into a man. He then gave his full statement to the police that he later signed. Appellant denied that he had attempted to rape or to drag any girl behind an icehouse or any other place. He denied that any girl had struggled with him or called out "Help, Help." He denied that he had said "Hush." He could not recall if the girl had ever said "Ow! Ow!" When appellant was asked why he didn't tell Harper about his fight with the man who struggled with him at the corner, appellant stated that he didn't tell him because Harper was so intoxicated he could do nothing about it.

░░ As the first ground of his appeal appellant contends that the foregoing evidence is legally insufficient to sustain the conviction. In this connection he relies upon *People* v. *Craig*, 49 Cal.2d 313 [316 P.2d 947]. However, our Supreme Court in the first appeal, (*People* v. *Miller, supra,* 57 Cal.2d 821, at page 827) distinguishes the facts herein from those in *People* v. *Craig, supra,* 49 Cal.2d 313. It pointed out that, unlike *Craig,* there was a witness, Harper, who saw the actual encounter between appellant and his victim and another witness who heard part of such encounter. Likewise in *Craig* the court, in reversing the judgment, relied strongly on the absence of blood in certain areas of the clothing of the defendant whereas in our case there is no similar circumstantial evidence pointing affirmatively to the absence of rape or attempted rape. After a consideration of substantially the same facts as are here presented the Supreme Court found such evidence sufficient to support the inference drawn by the jury that the homicide was committed in perpetrating or attempting to perpetrate rape and therefore sufficient to support the finding of murder in the first degree. We reach the same conclusion from the evidence herein.

Appellant next contends that the deputy district attorney,

who prosecuted the case against him, was guilty of prejudicial misconduct in his reference to appellant's prior offense of robbery, a felony.

■ Appellant took the stand in his own defense. He thereby waived the protection given by Penal Code section 1025. Accordingly, the cross-examination disclosed that appellant was previously convicted for unarmed robbery. The prosecutor then made the following comments in argument: ". . . There are those types of felonies, or that type of a felony, that Richard Miller was convicted of, unarmed robbery. And what is robbery? It is taking of money by force or threats of force or by fear with the intent to permanently deprive that person of his property.

"Now you are getting into the matter of felonies, and he was convicted of that, but there is the question of determining his credibility. Is a man who has been convicted, or committed a robbery, who has been convicted of that crime, is he the type of man that is likely to get up on this witnesss stand and tell you the truth? . . . The law says you are entitled to take into consideration that type of conviction or this type of conviction that involves a basic principle, and that is the principle of honesty, and that is telling the truth, and that is what robbery is, just simply stealing; and what is stealing, thievery; and he has been convicted of thievery by force, unarmed robbery, he says, and that means that he was able to do it without a gun.

"MR. BRILL: Just one moment, your Honor, please. I think the District Attorney is, by inference, suggesting that the defendant was convicted of robbery by force, and that is not the evidence.

"THE COURT: Further than that, any previous convictions are only to be used for one purpose, impeachment."

Appellant now claims prejudice because of the words, "thievery by force." It is contended that the word "force" may have caused the jury verdict in the higher of the two possible degrees of the crime charged; that the jury may have been influenced to think of appellant as a person prone to the use of force.

■ Robbery is defined in the Penal Code, section 211, as a felonious taking accomplished by means of force or fear. The prosecutor thus pointed to robbery as it is defined, as accomplished by force. Certainly, no evidence is necessary to refer to robbery in the terms of the statute. Moreover, it is clear that the prosecutor throughout this portion of the argu-

ment was calling attention to the credibility of the appellant; particularly whether the nature of his prior conviction should be considered for impeachment. This was proper. (*People* v. *Brain,* 17 Cal.App.2d 141, 143 [61 P.2d 806].) Thus, the matter of impeachment was the subject of this portion of the argument. It was not as appellant suggests the use of impeachment as a guise or a cloak for any other purpose.

Appellant promptly registered his objection. The trial court thereupon pointed out that any prior convictions could be used only for purposes of impeachment.

Not only is there no showing here that the prosecutor was in error in these remarks, but even if error be assumed, the prompt objection and admonition of the trial court must have clarified the matter for the jury. Appellant does not suggest that in this case the objection and admonition by the court would not be sufficient to cure this claim of misconduct. In view of the care exercised by the trial court in this instance such a showing would have to be made if this claim is to be given further consideration. (*People* v. *Lyons,* 50 Cal. 2d 245, 262 [324 P.2d 556] ; *People* v. *Hampton,* 47 Cal.2d 239, 240-241 [302 P.2d 300].) No prejudicial error resulted. (*People* v. *Russel,* 214 Cal.App.2d 445, 454 [29 Cal.Rptr. 562].)

Appellant next contends that the court erred in admitting hearsay testimony for the purpose of rehabilitating the witness Charles Harper. Harper testified that he told his landlady, Mrs. Armour Lee Young, the next day, what he had seen and heard that connected appellant with the crime. At the conclusion of the cross-examination of this chief prosecution witness, the People called Mrs. Young as a witness. Over the objection that such evidence was hearsay, this witness was permitted to recount her conversation with Harper wherein he told her what he had witnessed the night before. Harper related to her the facts that connected appellant with the commission of the homicide. She then took Harper to the police.

The trial court instructed that this hearsay evidence was received under the limitation that it was not for the purpose of proving the truth of what was said but only for the purpose of testing the credibility of the witness.

Appellant contends that there was nothing in the cross-examination of the prosecution witness Harper that warranted the trial court in receiving such evidence. This evidence was admissible as a prior consistent statement received

to rehabilitate Harper as a witness. It was also admissible to assist in the identification of the appellant.

The record shows the following cross-examination: (MR. BRILL).

. ''Q. About all you saw was a girl standing there by the corner? A. That is right.

''Q. And then you saw somebody grab her or push her into the yard, or out of your sight?

''MR. SCHULMAN: I will object as that is a misstatement of the evidence. His testimony was that he saw Richard Miller do it.

''THE COURT: Yes. It will be sustained.''

Witness Harper identified appellant as the person who pushed a girl behind a building and heard the girl call out ''Ow! Ow!'' and this incident took place in the general area where the girl's body was found. He also identified appellant as the man who said, ''You ain't seen me.''

Affirmative recognition of the accused may be dimmed after the passage of time and to corroborate such a witness it is proper to prove that at a former time when the suggestions of others could not have intervened to create a fancied recognition in the witness' mind, he declared the present accused to be the person. (*People* v. *Slobodion,* 31 Cal.2d 555, 560 [191 P.2d 1].)

The record also discloses circumstances that demonstrated a need to rehabilitate the witness Harper. Although he had testified in the former trial, he was unable to either read or write. The customary procedure wherein the witness reads his testimony given on the former trial before he is required to answer cross-examination questions was not one that could be followed in the present case. Instead, because Harper was unable to read, the procedure followed was to read to him directly the text of what he had said on the former trial and then ask him if those were the statements he had made. Thus, Harper was not given the ordinary opportunity to examine his former testimony with any deliberation.

Certain of the cross-examination raised the inference that the witness Harper was not being truthful. This cross-examination sought to show that Harper had given two different stories as to when he had observed appellant grab the deceased girl and push her behind the building. It also raised the question whether it was the same girl. Harper testified that the deceased victim was short. This was confirmed by the coroner's testimony that the body of the deceased measured

59 inches in length. However, the cross-examination at the former trial showed he had testified that the victim was of medium height which he thought was 5′ 5″. The cross-examination also went into the lighting conditions. This examination raised the question as to whether the light was sufficient for proper identification.

The prosecution largely relied upon the testimony of the witness Harper in the first trial. The judgment resulting from that trial had gone from the trial court to the appellate court and then had been reversed by the Supreme Court. The witness was called upon to testify in August 1962 concerning incidents that occurred in 1960. Transcripts of his testimony in the previous trial were available but the witness was unable to refresh his recollection from the reading of the transcripts of his prior testimony. Under such circumstances he was particularly vulnerable to cross-examination and it was demonstrated that his present testimony did not conform in detail with his testimony at the previous trial. The jury might, therefore, reasonably conclude that his present testimony was a recent fabrication; that if they could not believe the details of his present testimony, then perhaps all of his testimony might be rejected. Harper was the principal witness able to connect appellant with the crime. Under these circumstances the prosecution could properly show that before going to the police, Harper had told his landlady what he had witnessed and the facts so stated clearly disclosed appellant's connection to the crime. Evidence of Harper's prior consistent statement was therefore properly received. (*People* v. *Hardenbrook*, 48 Cal.2d 345, 351 [309 P.2d 424].) The propriety of answering an express or implied charge of recent fabrication with proof of the witness' prior consistent statements is well recognized. (*People* v. *Volk*, 221 Cal.App.2d 291, 297 [34 Cal.Rptr. 351].)

The prosecutor made it clear that the testimony of the landlady was offered for the purpose of rehabilitation of the witness Harper. The applicable principle was stated in *People* v. *Basnett*, 186 Cal.App.2d 108, 121 [8 Cal.Rptr. 804]:

". . . When the cause for fabrication is faulty memory and the prior statement was made at a time when that cause did not exist, the requirements of the rule are met. . . ." Certainly this is the factual situation present here. Harper was trying to testify consistently almost two years after the facts occurred. He was unable to refresh his memory from the transcripts of the previous trial and his faulty memory

showed in his testimony. As stated in *People* v. *Basnett, supra,* the requirements of the rule were met.

We have considered the several other grounds for reversal asserted by appellant and find them to be without merit.

The judgment is affirmed.

Herndon, Acting P. J., and Fleming, J., concurred.

A petition for a rehearing was denied December 9, 1964, and appellant's petition for a hearing by the Supreme Court was denied January 20, 1965. Mosk, J., did not participate therein.