[Crim. No. 13506.    Second Dist., Div. Five.    Sept. 16, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM H. FANNING et al., Defendants and Appellants.

Daniel L. Dintzer and Herbert E. Selwyn, under appointments by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Elizabeth Miller and Robert F. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

KAUS, P. J.—Defendants Fanning and Blake were jointly tried for the robbery of a Safeway store on Saturday June 18, 1966. Both were found guilty. After the robbery in question the defendants escaped in an automobile driven by Fanning. The police gave chase. At one point Fanning fired a bullet in the direction of Officers Finch and Thompson. Counts II and III of the information charged both Fanning and Blake with assault with a deadly weapon and alleged that they knew that the victims were police officers engaged in the performance of their duties. (Pen. Code, § 245, subd. (b).) Fanning was found guilty on counts II and III, Blake was acquitted. Both appeal,

In view of the contentions made and the conclusions we have reached the facts can be summarized very briefly: in the early morning hours on June 18, 1966, both defendants were hanging around the market in question. The factual testimony of various employees supports a conclusion that they acted in concert. At one point Blake bought a bottle of vodka. A little later Fanning, at gun point, forced an employee to hand him $82. His behavior after the robbery could be interpreted as somewhat odd. Apparently in no hurry he headed toward a closed door. The store manager, who knew that there had been a robbery, told him that the door would not be opened until 9 a.m. Fanning misunderstood because he then tried to exit through the entrance portion of the locked door. Finally he walked toward the other door "glancing back, you know, over his shoulder." He walked rather slowly.

Blake was observed in the car. One of the food clerks testified as follows: ". . . I saw Mr. Fanning on his way out, which he tried to go out in a door which we have it locked during the night, and I told him, 'This door is locked.'[1] 'Would you please use the other door,' and then when he went outside Mr. Blake was in the car. Then he ducked down and Mr. Fanning took the wheel, and they drove off."

Soon after they left the market, both defendants were pursued by the police. Officers Finch and Thompson heard about the case on their radio. They tried to intercept defendants and were successful in doing so. When they saw the car, Finch who had been sitting on the passenger side, left the car, drew his pistol and pointed it at defendants' oncoming vehicle. When defendants were about 30 feet away, Finch saw Fanning's left arm out of the window and as the car went by he saw a puff of smoke and heard a pop. He did not hear the whine of a bullet. Officer Thompson actually saw a gun in Fanning's hand. He too heard a pop.

One officer estimated that the pursuit lasted seven or eight minutes and covered 10 to 15 miles!

When the chase finally ended and both defendants were arrested, a pistol was found in the automobile. Four loose rounds of ammunition were in Fanning's right coat pocket. The gun was jammed by an expended cartridge.

After Fanning's arrest he was given the required constitutional warnings. He said that he had gone into the market,

---

[1]The record is not clear whether this witness was attempting to describe the same incident as the manager.

made some purchases and discovered that he had no money. He then left the store and was immediately apprehended. When asked about the money on his person at the time of the arrest he said: ''Well, most of that money belonged to Safeway.'' Asked about the expended cartridge and the shot that was fired he said nonresponsively: ''Oh, the robbery, I am not innocent.''

Fanning's defense was that shortly before entering the market he had taken LSD and after entering, started ''tripping.'' He was ''thinking all kinds of thoughts.'' In a way he knew what he was doing, in another way he did not. He does not drink, yet he wanted to buy alcohol: ''. . . I bought —I had some cigarettes. I had some cigars, anyway. I got up there and then I went and got—went to take out my wallet. Then I remembered I don't have any money, so then I—well, I—I remembered the gun, so then I said, 'Give me the money.' So, I ended up with the money. Then I took the bag and went on outside and got in the car. I started driving away and I remember going by the police, and they started chasing us and everything, and that was it, generally.'' The chase itself he only remembered very vaguely. He did not recall any shooting.

Blake's defense was a lot simpler but more easily refuted by the testimony of the eyewitnesses in the store: he and Fanning simply testified that while Fanning was in the store Blake remained in the automobile, asleep, and when he awoke the chase was already on. From something Fanning said Blake knew that there was trouble, but nevertheless he went back to sleep.

### Fanning's Appeal

Fanning contends that the evidence does not support the verdict of robbery, that the trial court gave inadequate instructions to cover the issues raised by the evidence of Fanning's intoxication, that the evidence does not support the verdict of assault with a deadly weapon, and—in very oblique fashion—[2] he also raises the question of diminished capacity with respect to the assault counts.

The evidence is obviously more than adequate to support the verdicts on all counts. The argument that it is not is based entirely on the assumption that Fanning's testimony of having taken LSD must be accepted. Clearly, that is not so.

---

[2] ''In addition, it is also submitted that the People have failed to establish that the defendant was capable of harboring an intent to harm another person at the time of the alleged assault.''

The People concede that the court did not adequately instruct the jury with resepct to the legal issues raised by Fanning's evidence that he was under the influence of LSD when he committed the crimes in question.

The burden of the defense was that because of his intoxicated state Fanning did not form the specific intent to commit robbery. The vice of the instructions was that the jury was not informed that a specific intent to steal was an essential element of the crime of robbery. (*People* v. *Butler*, 65 Cal.2d 569, 572-574 [55 Cal.Rptr. 511, 421 P.2d 703] ; *People* v. *Ford*, 60 Cal.2d 772, 793 [36 Cal.Rptr. 620, 388 P.2d 892]), nor was it told that it should consider his state of intoxication in determining if Fanning had that requisite intent.[3]

The People also concede, citing *People* v. *Baker*, 42 Cal.2d 550, 576 [268 P.2d 705] and *People* v. *Arriola*, 164 Cal.App.2d 430, 434-435 [330 P.2d 683], that "the law is well established that the trial court must, even on its own motion, instruct the jury that intoxication may negate the element of specific intent."

It is, of course, thoroughly settled that the intoxication which may negate a specific intent need not be induced by alcohol. (*People* v. *Baker, supra,* p. 572; cf. *People* v. *Fair*, 254 Cal.App.2d 890, 893-896 [62 Cal.Rptr. 632].)

It is claimed, however, that the error is not prejudicial. On this point the People rely on *People* v. *Spencer*, *supra*, pages 87-89 and *People* v. *Arriola, supra*, pages 435-437. (See also *People* v. *Teale*, 63 Cal.2d 178, 193 [45 Cal. Rptr. 729, 404 P.2d 209] and *People* v. *Miller*, 57 Cal.2d 821, 830-831 [22 Cal.Rptr. 465, 372 P.2d 297].) In *Teale, Spencer, Miller* and *Arriola* it was held that the evidence of intoxication was not substantial. We cannot agree that this is the case here. Quite apart from defendant's own testimony, his bizarre behavior after the robbery, the attempt to exit through two locked doors, his slow walk through the market followed by his suicidal speed through miles of city streets during the Saturday morning traffic peak and his unusually phrased con-

---

[3]The vital instruction which was not given is CALJIC 78-B (revised). This should have been coupled with an instruction to the effect that intoxication resulting from drugs has the same legal effect as intoxication induced by alcohol. The court did give CALJIC 210, but that instruction is only the code definition of robbery (Pen. Code, § 211) and says nothing about any specific intent. The court also gave CALJIC 78 as it read before its most recent revision, an instruction which should not be given where the crime requires specific intent. (*People* v. *Spencer*, 60 Cal.2d 64, 86-87 [31 Cal.Rptr. 782, 383 P.2d 134].) The error was not even theoretically alleviated, as it was in *Spencer*, by the giving of CALJIC 72-B.

fession to the police lend enough substance to his story that the court's failure to instruct on the only defense he had must be deemed prejudicial.

At the oral argument counsel for Fanning made the contention which he now admits he should have made in his brief, namely that the same error occurred with respect to the two counts of assault with a deadly weapon. The matter was argued and we are satisfied that the People are not prejudiced by the late raising of the issue.

In spite of occasional statements to the contrary (*People* v. *Gaines*, 247 Cal.App.2d 141, 148 [55 Cal.Rptr. 283]; *People* v. *Claborn*, 224 Cal.App.2d 38, 42 [36 Cal.Rptr. 132]), we think it now settled that assault is a specific intent crime. (*People* v. *Coffey*, 67 Cal.2d 204, 221-222 [60 Cal.Rptr. 457, 430 P.2d 15]; *People* v. *Wilson*, 66 Cal.2d 749, 757-760 [59 Cal.Rptr. 156, 427 P.2d 820]; *People* v. *Carmen*, 36 Cal.2d 768, 775-776 [228 P.2d 281]; *People* v. *Wheeler*, 260 Cal.App.2d 522, 525 [67 Cal.Rptr. 246]; *People* v. *Corson*, 221 Cal.App.2d 579, 581 [34 Cal.Rptr. 584].)[4] "One could not very well 'attempt' or try to 'commit' an injury on the person of another if he had no intent to cause any injury to such other persons. . . ." (*People* v. *Carmen, supra,* p. 775.)

The same reasons which compel a reversal of the conviction for robbery, demand a like result with respect to the assault counts.

## Blake's Appeal

The sufficiency of the evidence is not attacked. Blake, however, claims that he too was the victim of the court's failure to instruct on the significance of intoxication from LSD.

We disagree with Blake's counsel that there is any evidence that Blake had taken LSD. As already noted, his own testimony was that when he and Fanning left what he believed to be the last point of call before the robbery, he immediately went to sleep, since he had not slept for three or four days. He never went into the market with Fanning and woke up during the chase. This was completely corroborated by Fanning. The relevant portion of his testimony is as follows: "It—I went by a friend's house, and we got in the car. *Blake*

---

[4] The California cases on that point are analyzed in 92 A.L.R.2d 635. The confusion seems to be, in part at least, traceable to the rule that the intent may be inferred from the act. (*People* v. *McCoy*, 25 Cal.2d 177, 194-195 [153 P.2d 315].) The fact that one element of a crime may be inferred from proof of another does not decrease the number of elements.

*was sleeping.* He was out. I was supposed to take him home. It was in the morning. I had some place to go—anywhere. I don't—what I was doing was using his car when I take him home, but on the way I decided—he went to sleep, so I would just go on out there, so I went out there. We rode around for a little while and we—back to the guy's house. Well, I actually—we took some LSD, is what it amounts to. So, on the way back, well, he left his coat in the car. On the way back I stopped off to get some cigarettes and in the pocket of the coat was his gun, so I took it and stuck it in my pocket, went inside of the store there, started—well, tripping, actually, I guess you call it. I don't know. I didn't really know what I was doing, is what it amounts to. . . . I was there by myself. I—that is important, itself, also. Blake didn't—when I left the car, well, *he didn't wake up from the time,* actually, generally, right after *he got in the car until—until we were going down the street there."* (Italics ours.)

Blake claimed Fanning's statement "we took some LSD" could be interpreted to refer to Fanning and Blake rather than to Fanning and the friend. To do so one would have to take the statement entirely out of context. Of course the friend may well be nothing but a product of Fanning's imagination, necessary for a plausible explanation of his possession of a gun, but this possibility does not permit us to substitute Blake in the place of the nonexistent friend.

█ The failure to advise the jury that robbery required a specific intent to steal was error, whether or not Blake was intoxicated. (*People* v. *Ford, supra,* pp. 792-793.) Under the circumstances of this case the error was obviously harmless.

Of course the case against Blake was not a very strong one. The record establishes that on the day he was arrested he was wearing a closely cropped goatee and a narrow moustache. Some of the witnesses in the market thought that the person they saw was clean shaven. His conduct was equivocal and did not compel the inference that he was aiding and abetting Fanning. His problem, however, is that the error was not committed with respect to that part of the People's case which was weak. Once the jury had no reasonable doubt that Blake was in the store and that he was aiding and abetting the robbery, it is inconceivable that it could have failed to find the necessary intent, even had it been correctly instructed. As the People argue, *People* v. *Ford, supra,* is directly in point and no further discussion is necessary.

In his opening brief, filed before *People* v. *Feggans,* 67 Cal.2d 444, 448-449 [62 Cal.Rptr. 419, 432 P.2d 21], Blake's counsel claims a violation of his client's right to have counsel present at a lineup in which he was placed after his arrest and during which he was identified by some of the witnesses. Since, in *Feggans,* our Supreme Court held that the right to have counsel present at the lineup was only as retroactive as the Supreme Court of the United States required it to be (*Stovall* v. *Denno,* 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967]), the point has no merit. Nor is there anything in the record which would suggest any unfairness in connection with the lineup.

The judgment against Fanning is reversed. The judgment against Blake is affirmed.

Stephens, J., concurred.

MOOR, J. pro tem.*—I dissent from the reversal as to Fanning.

Before it becomes mandatory upon the trial court to instruct on intoxication there must be *substantial* evidence in the record of the defendant's intoxication and its effect upon him. (*People* v. *Spencer,* 60 Cal.2d 64 [31 Cal.Rptr. 782, 383 P.2d 134]; *People* v. *Arriola,* 164 Cal.App.2d 430 [330 P.2d 683]; *People* v. *Teale,* 63 Cal.2d 178 [45 Cal.Rptr. 729, 404 P.2d 209]; *People* v. *Miller,* 57 Cal.2d 821 [22 Cal.Rptr. 465, 372 P.2d 297]; *People* v. *Ford,* 60 Cal.2d 772, 792-793 [36 Cal.Rptr. 620, 388 P.2d 892].)

Here, we have a situation quite apart from the usual contention of diminished capacity arising from the overindulgence in intoxicating liquor giving rise to periods of blackouts, no recollection of times and places or of the facts relating to the commission of the offense charged.

In the instant case defendant Fanning recalls in detail the events surrounding the robbery and his subsequent flight, except that portion relating to the shooting at the officers. Not only did he remember the events at the time of his arrest, but he also remembered them many months later at the trial. This leaves us with the question, does one who partakes of LSD suffer intoxication similar to that which occurs as a result of overindulgence in alcohol or is it an entirely new and different condition? And if the latter be true, to what degree is one's ability to form specific intent affected?

---

*Assigned by the Chairman of the Judicial Council.

The question itself supplies the answer. Lacking any expert evidence of the nature of LSD and its effect upon the human mind it would be the gravest error to submit this question to the jury by means of the instruction on intoxication proposed in the majority opinion, compelling them to depend upon fragmentary information obtained from their own research or from articles in magazines and news media, and their own speculations.

If diminished capacity arising from the use of LSD was to be the defendant's defense to the charge it was encumbent upon him to supply the necessary expert evidence to guide the jury in their determinations. Failing to do this, the court was not in error in not giving the instruction on intoxication. Finally, it taxes the imagination severely to conclude that the jury could bring in any other form of verdict considering the admissions of the defendant that he pointed the gun at the cashier, demanded and took the money from him, then fleeing from the police in a high speed chase, and attempting to stop the police by shooting at them. While it was error for the court to fail to instruct the jury on the elements of the offense charged, the error, however, was not prejudicial here. (Cal. Const., art. VI, § 4½; *People* v. *Ford,* 60 Cal.2d 772, 792-793 [36 Cal.Rptr. 620, 388 P.2d 892].)

I would affirm the judgment of conviction as to both defendants.

A petition for a rehearing was denied October 4, 1968, and petitions of appellant Blake and the respondent for a hearing by the Supreme Court were denied November 13, 1968.