Charles E. GOODMAN, Appellant
(Defendant below),

v.

The STATE of Wyoming, Appellee
(Plaintiff below).

No. 4706.

Supreme Court of Wyoming.

Dec. 7, 1977.

Dallas J. Laird and Gary L. Shockey, Casper, for appellant.

V. Frank Mendicino, Atty. Gen., Marilyn S. Kite, Senior Asst. Atty. Gen., Cheyenne, and Daniel M. Burke, County and Pros. Atty., Natrona County, Casper, for appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

ROSE, Justice.

Charles E. Goodman appeals from judgments and sentences flowing from jury verdicts finding him guilty of murder in the first degree and killing an unborn child by assault on the mother. We will reverse the verdict and judgment of first-degree murder of Donna Poole. The verdict and judgment entered herein finding the appellant guilty of killing an unborn child will stand affirmed. The questions Goodman brings here are:

(1) whether the failure to give certain requested instructions and the giving of certain erroneous instructions constituted a denial of due process of law and effective assistance of counsel;

(2) whether appellant was denied due process of law by the court's restriction of expert testimony and by the admission into evidence for substantive purposes of a letter discrediting the expert;

(3) whether appellant was denied due process of law in that items not received in evidence were present in the jury room during deliberation;

(4) whether the admission into evidence of a Federal Bureau of Investigation report violated appellant's right to be confronted with the witnesses against him;

(5) whether sentences on both convictions put the defendant in jeopardy twice for the same offense;

(6) whether the admission into evidence of an enlarged color photograph of a dead fetus was without proper foundation and without probative value and was extremely prejudicial;

(7) whether a weapon and the results of tests performed on it should have been suppressed; and

(8) whether the guilty verdicts were supported by sufficient evidence and were in conformity to law.

We will, in this opinion, find reversible error in the court's refusal to give an intoxication instruction to the jury in the first-degree murder case. We will find no error in any of the other assignments called up by the appellant.

## FACTS

Background facts, excepting only those which concern themselves with the appellant's alleged intoxication, are these:

On June 12, 1975, Dale Fitzsimmons heard arguing, shouting and a rifle shot apparently emanating from a house on Coulter Street in Casper, Wyoming, from which Charles Goodman soon emerged carrying a rifle, which he placed in a car. After once re-entering the house, he returned to the automobile and drove away. Fitzsimmons called the police and, upon arrival, they discovered the body of a young, pregnant woman who, it was later learned, was Donna Poole.

Later that day, Goodman was arrested at the Townsend Hotel Bar in Casper, at which time and place he was searched and handcuffed. Upon departing with Sergeant Ernest L. Johnson of the Casper Police Department from the hotel, which was one block from where Goodman's car was parked across the street from the police station, the officer advised the defendant of his constitutional rights. As they were walking down the street, Goodman pointed out his car to Johnson and expressed concern for his dog which was in the vehicle. The defendant asked Johnson to roll the window down so the dog would have some fresh air and, while complying with Goodman's request, Johnson inquired where the rifle was, whereupon the defendant informed the officer that it was just behind the seat. Johnson, without further ado, thereupon took possession of the rifle and carried it across the street to the police station while, at the same time, accompanying Goodman there.

Upon their arrival at police headquarters some two hours after the shooting, Johnson directed the defendant to an interview room, again advised him of his rights, and, together with the County Attorney, undertook to interrogate him concerning the death of Donna Poole. With certain deletions, tape recordings and a transcript of this interview were received in evidence.

During the interrogation, Goodman stated that, after a brief argument, he shot Donna, the girl with whom he was living and who was pregnant by him. He told the police that Donna screamed that she was going to "fix" him and they both reached for and took hold of a gun, which both of them knew to be loaded. Defendant related that the weapon was located in a corner of the room behind a door and he said it

was kept loaded in response to threats by individuals with whom he had previously had an altercation. To the best of Goodman's recollection, the gun discharged in the struggle for its possession, the bullet striking Donna in the right temporal portion of the head killing her, with the resulting death of her unborn child.

At trial, various witnesses testified that a bullet entered the wall of a room at 2644 Coulter Drive at a distance of five feet, eight and five-eighths inches from the floor.

Delma R. Winkelvoss, an employee of the Federal Bureau of Investigation, testified that she was a fingerprint specialist and that she did not find any prints on the rifle. Neither did she observe any smudges on it.

Richard E. Schmidt, another Federal Bureau of Investigation employee, testified that he worked in the firearms identification branch. He examined the rifle and found that it operated normally. No gunshot residue was found on the victim's clothing, which, he opined, would be present if the rifle had been fired at a distance of approximately one foot from the victim's head—assuming the weapon was pointed in that direction.

Dr. Charles E. Wood, an obstetric gynecologist, testified that Donna Poole had been his patient. It was the doctor's opinion that her baby was alive in her womb when she was killed.

Sergeant Johnson, who had arrested Goodman, testified that he had participated in further investigation of the incident and that in his judgment the door behind which the rifle had been kept would have had to be completely open when the rifle discharged. He testified further that his investigation revealed that only one shot was fired in the incident resulting in Donna Poole's death.

Patty Jo Bellamy testified that she saw Goodman hit a woman with whom he was arguing on June 10, 1975, at a house on Coulter Drive. Mary Hutsell testified that on June 10, 1975, Goodman grabbed a woman by the hair and propelled her toward the same house.

Dr. Gregory Brondos, a pathologist, performed an autopsy on Donna Poole and her unborn child. He found bruises on her left arm and at her knees. Those on her arm were consistent with fingermarks. From finding hamburger in her esophagus and stomach, he concluded that she had been eating a hamburger within minutes of her death. He also stated that he found chewing gum in her esophagus.

## FACTS CONCERNING THE ISSUE OF INTOXICATION

In addition to the fact that defendant's alleged intoxication was mentioned on voir dire and, according to the briefs of the parties, also in closing argument, relevant facts and evidence which bear upon defendant's ingestion of alcohol and his actions before, during and after the shooting of Donna Poole are these:

In his statement given to the police two hours after the shooting, which occurred at about 3 p. m., the defendant testified concerning his intake of alcoholic beverage since 10 a. m.:

"Q. Okay, let's go back to today—after you got through drinking at the Townsend. How much did you have to drink?

"A. I drank a lot.

"Q. How much?

"A. Ten-twelve drinks of Millers, plus eight or nine drinks of Walkers and Coke. I drink that all the time."

He had at least two more drinks after the shooting and before he was arrested immediately after which he gave his statement to the police.

The defendant's own appraisal of his state of intoxication varied. At one point he said, when referring to how much alcohol he had consumed and whether or not he was aware of his actions on the day in question:

"A. Well that's mellow.

"Q. Mellow? You mean slobbering drunk?

"A. No.

"Q. Do you know what you're doing?

"A. At times.

"Q. Now, what do you mean by that?

"A. Well, I mean if I set there long enough, I'd be drunk.

"Q. But you didn't drink enough to get drunk today did you?

"A. Well here wait a minute. *I'm drunker now than—than I was this morning.* I knew what I was doing. An argument started. She grabs the gun, and it goes off. I don't know how, but it goes off. Solo." [Emphasis supplied]

At about this point in the interrogation, the defendant said:

"Look, I'm not drunk and I'm tryin' to be honest. I wasn't doing a thing to her, I do know that. I do know cause the girl just tiptoes through the door."

When asked about his quarrels with Donna, he responded:

"I leave and I come back to town and I drink. I can drink a lot. In fact, I've drank a lot today. I can see nothing wrong with drinking as long as I control myself. And I do, most usually. And I did today. I thought I done good. It's just like when he walked in, I knew who he was. I didn't try to offer no resistance. I don't wanna cause no trouble."

When asked about the circumstances surrounding the shooting, the defendant testified with apparent clear recollection in response to some questions—gave various conflicting interpretations concerning other facts about which he was asked—and testified that after he and the victim started arguing he did not know what happened until she was lying on the floor. He said:

"She come in, we started arguing. I stood up and I cain't [sic] remember if I got my cup of coffee when I got there or anything. I know I got a cup of coffee. We started arguing back and forth when she got there. I don't know, things just got out of hand. I don't—after that I really don't know what happened 'til she was laying on the floor."

When the interrogation became more intense, the defendant allowed that he did not "know what was going on." He said:

"I'm trying to tell you. Now, I haven't tried to hide nothing from you. Now, we can sit here for a week, and we can still be going over the same thing. I don't know why. *I don't know what's going on.* Now, I admitted to you what happened. I'm not trying to get out of anything, so now if a witness wants to come in and say, heah, he shot her, I'm gonna say I shot her. I'm not gonna lie on that." [Emphasis supplied]

At another juncture, the defendant testified:

"I grabbed the rifle and swung like this and it went off cause that's all I know. That's all I know. She ah, had, she grabbed at the rifle. It was setting in the corner. There's a tv setting right there too. She grabbed the rifle, and I grabbed it. And I swung it around and it went off. *I don't know—I don't know what happened.* It's always loaded cause the Saints got ahold of me two or three weeks back, and they, they beat me up pretty bad and they threatened her. So I always loaded it. . . ." [Emphasis supplied]

Defendant confessed to having problems with his memory, which he guessed might be corrected the next day. He testified:

"We just got to mouthing off. *I can't really remember things. Maybe tomorrow I can, but right now I can't.* I'm not trying to hide nothing from you. I'm just trying to tell you. I'm trying to be honest with you." [Emphasis supplied]

Between the shooting and the arrest—a two-hour time span—the defendant had been to the bank to cash a check and make a savings-account withdrawal and, even though other evidence showed that the defendant could read and write, he asked the bank teller to make out his check and withdrawal slip, and the bank teller testified:

"A. When he came to the window he was kind of quiet, he was pretty passive and like I said I think he had been drinking some because I could get it when he talked, would lean real close to the window and

kind of on it and when he talked I could smell it coming down through our tray where we put our deposits, just the alcohol smell. He was kind of quiet, didn't say much, except when I filled it out and when I gave him the money."

There was some variation in the evidence with respect to the amount the defendant had to drink on the day in question—but it appears minor. Officer Johnson of the Casper Police Department testified:

"Q. And then you got to the point of asking him how much did you have to drink? And he said, I drank a lot, and then you said, 'How much'? And then he gave you a guess, 10 to 12 drinks of Miller's plus 8 or 9 drinks of Walker's and Coke. I drink that all the time. Did you check that out?

"A. Yes, sir.

"Q. Were you able to determine how much he had to drink?

"A. Yes, sir, wasn't quite that much.

"Q. Didn't have that much to drink?

"A. No, sir, he did not.

"Q. So his guess was incorrect?

"A. Yes, sir.

"Q. Do you know he had a couple drinks out at the Beacon?

"A. Yes, sir.

"Q. Did you take that into account?

"A. Yes, sir.

"Q. Did you take into account the drinks he may have had at home before he left?

"A. No, sir, I did not.

"Q. So if you didn't take that into account might have to agree with him there. Is that correct?

"MR. BURKE: Well, the evidence is he wasn't home.

"MR. LAIRD: Well, the Lord Manor Motel.

"A. I would have no way of knowing or substantiating whether he drank it or not."

The officer testified that in his opinion the defendant was not drunk when he observed him on the date in question.

## FAILURE TO INSTRUCT ON INTOXICATION

It is the contention of the defendant, based on the foregoing and all other pertinent evidence of record, that one of the offered instructions, or one similar to those offered, should have been given to the jury affirmatively relating defendant's theory that he voluntarily became, and was at the time and place of Donna Poole's death, intoxicated and, therefore, incapable of killing her "purposely and with premeditated malice" (§ 6–54, W.S.1957). He further contends that the court's failure to give such an instruction was fatally prejudicial and therefore reversible error in that he was denied a fair trial.[1]

1. The State requested the following instruction, which was refused by the court:

"YOU ARE INSTRUCTED that drunkenness is not a defense or an excuse for any crime. A man who voluntarily puts himself in a condition to have no control of his actions is held to be accountable for his acts as if he had been possessed of sound reason and discretion.

"However, our laws provide that when the crime rests in intention, the inebriated condition of the person at the time of the commission of the crime may be proven as bearing upon the question of intention. Murder in the first degree is charged in the Indictment and the included offense of murder in the second degree both include the necessary element of intent. Intoxication itself does not preclude a finding that the requisite mental element was present, unless it was so extreme as to render the accused entirely incapable of the state of mind required.

"If the jury believes from all the evidence that a Defendant committed a crime at a time when he was so intoxicated from alcohol as to render him incapable of forming an intent in those crimes calling for intent or premeditation, you would have to find a defendant not guilty accordingly. Intoxication is only one of the circumstances to be considered in determining whether intent or premeditation was present or absent.

"The defense or excuse of drunkenness is not available to a person who forms an intent to commit a crime before becoming intoxicated. If the jury believes that a Defendant premeditated or formed intent as required for a particular offense prior to becoming intoxi-

Defendant was charged with and found guilty of first-degree murder. Section 6–54, W.S.1957, pertaining thereto, provides in relevant part:

"Murder in the first degree.— *Whoever purposely and with premeditated malice* or in the perpetration of, or to attempt to perpetrate any rape, arson, robbery, or burglary, or by administering poison or causing the same to be done, kills any human being, is guilty of murder in the first degree . . . ." [Emphasis supplied]

Section 6–16, W.S.1957, is concerned with the effect of drunkenness upon intent. It provides:

"Drunkenness not an excuse; effect upon intent.—Drunkenness shall not be an excuse for any crime or misdemeanor, unless such drunkenness be occasioned by the fraud, contrivance or force of some other person or persons, for the purpose of causing the perpetuation of an offense, in which case the person or persons so causing said drunkenness for such malignant purpose, shall be considered principal or principals, and suffer the same punishment as would have been inflicted on the person or persons committing the offense, if he, she, or they had been possessed of sound reason and discretion. *Where a crime rests in intention, the inebriated condition of the defendant at the time of committing the offense may be proven to the jury, as bearing upon the question of intention.*" [Emphasis supplied]

We have specifically held that in first-degree murder in Wyoming, voluntary intoxication is a defense as its effects bear upon the ability of the accused to formulate the premeditated malice requisite to the commission of the crime. *Gustavenson v. State,* 10 Wyo. 300, 68 P. 1006 (1902). In *Gustavenson,* we said

". . . But by statute in this state murder is divided into two degrees, and to constitute it in the first degree there must be *premeditated malice,* and such premeditation must be proved like any other fact. Upon a charge of murder in the first degree, therefore, the fact of the intoxication of the accused may be relevant and material as tending to show that the killing was not *premeditated*; and, *if it appears that at the time of the homicide he was so drunk as to be incapable of premeditation, or of forming any deliberate intent,* and there was no evidence of his having *premeditated* the crime prior to becoming intoxicated, the offense of murder in the first degree would not be made out. . . ." Ibid., 68 P. p. 1010. [Emphasis supplied].

We further said in *Gustavenson* that if the party charged

"was so intoxicated as not to know what he was doing, and was incapable, for that reason, of forming an intent, he was not guilty of murder in the first degree. . . ."

Transposing that rule to this case, it is the law in Wyoming that this defendant cannot

cated, then you must disregard the defense or excuse of intoxication.

"The mental state of a Defendant is a fact which a juror may take into consideration along with all other evidence in the case on the element of intent.

"Drunkenness at the time of committing the offense is not a defense or excuse for the crime of manslaughter."

The defense requested the following instruction, which was refused by the court:

"YOU ARE INSTRUCTED that although intoxication or drunkenness alone will never provide a legal excuse for the commission of a crime, the fact that a person may have been intoxicated at the time of the commission of a crime may negate the existence of a specific intent.

"So, evidence that a Defendant acted or failed to act while in a state of intoxication is to be considered in determining whether or not the Defendant acted, or failed to act, with specific intent, as charged.

"If the evidence in the case leaves the jury with a reasonable doubt whether, because of the degree of his intoxication, the mind of the accused was capable of forming, or did form, specific intent to commit the crime charged, the jury should find the Defendant not guilty of first or second degree murder. Drunkenness at the time of committing the offense is not a defense to the crime of involuntary manslaughter."

be found guilty of first-degree murder where, due to his voluntary intoxication, he was incapable of formulating the *premeditated malice* necessary to the commission of the crime. We approved an instruction in *State v. Riggle*, 76 Wyo. 1, 298 P.2d 349, where premeditation was explained to the jury in the following manner:

> "It requires that there should be time and opportunity for deliberate thought, and that after the mind has conceived the thought of taking life, the thought is meditated upon and a deliberate determination formed to do the act. This being done, it makes no difference how soon afterwards the fatal resolve is carried into execution. There need be no specific period of time between the formation of the intention in the mind to kill and the killing so long as there was some time for deliberation." 76 Wyo. at 48, 298 P.2d at 367.

Before the State can sustain a conviction of murder in the first degree, it must have been able to prove premeditated malice beyond a reasonable doubt. *Buckles v. State*, Wyo., 500 P.2d 518, 521. Premeditation and deliberation may, however, be inferred from the facts and circumstances surrounding the killing. *Buckles, supra.* It is for the jury to weigh all evidence of premeditated malice—direct and circumstantial. *State v. Riggle*, 76 Wyo. 1, 298 P.2d 349; *State v. Lindsay*, 77 Wyo. 410, 317 P.2d 506; and *Buckles v. State, supra*.

The rationale behind the voluntary-intoxication defense in specific-intent crimes is elaborated upon in *People v. Wilson*, 261 Cal.App.2d 12, 67 Cal.Rptr. 678, 681, where it was said:

> ". . . A mental disease or defect not amounting to legal insanity may impair the accused's ability to form that specific intent which constitutes an essential element of the crime charged, and evidence tending to prove or disprove the existence of that particular mental state is admissible. (*People v. Wells*, 33 Cal.2d 330, 346–347, 202 P.2d 53; *People v. Anderson*, 63 Cal.2d 351, 364–366, 46 Cal. Rptr. 763, 406 P.2d 43.) One cannot be

held responsible for the criminal consequences of an act when he is incapable of achieving the specific intent which constitutes an essential element of the crime. (*People v. Gorshen*, 51 Cal.2d 716, 727, 336 P.2d 492.) Although no act committed by any person while voluntarily intoxicated is rendered less criminal by reason of that condition (Pen.Code, § 22), yet whenever specific intent constitutes an essential element of the crime, the jury may take the person's intoxication into consideration in determining the purpose, motive or intent with which he committed the act. (*People v. Sanchez*, 35 Cal.2d 522, 526–528, 219 P.2d 9; *People v. Modesto*, 59 Cal.2d 722, 730, 31 Cal.Rptr. 225, 382 P.2d 33.)"

Some years prior to our opinion in *Gustavenson*, we recognized the effect of § 6–16, *supra*, upon the element of intention in a first-degree murder case. We held that whether or not the inebriated condition of the defendant affected his intention to premeditate first-degree murder was a jury question. *Cook v. Territory*, 3 Wyo. 110, 4 P. 887, 892–893. We said

> ". . . Counsel contend that the evidence shows that the slayer was intoxicated at the time of the homicide. Under our statute, voluntary drunkenness is not an excuse for any crime; but it is provided that 'where a crime rests in intention, the inebriated condition of the defendant at the time of committing the offense may be proven to the jury as bearing upon the question of intention.' Comp. Laws, p. 249, § 9.

> "There was considerable conflict in the evidence concerning the condition of the defendant with reference to sobriety. This was properly left to be weighed by the jury as bearing upon the question of intention, . . . ."

We said in a first-degree murder case, where the issue was whether or not the defendant was so inebriated as to know of and be aware of the consequences of his act of confessing:

> ". . . Necessarily this question must be determined on the facts of each

case as they arise. . . ." *Lonquest v. State*, Wyo., 495 P.2d 575, 582.

▪ In the context that voluntary intoxication is a temporary-insanity issue, where the specific-intent crime of first-degree murder requiring premeditated malice is charged, the question of temporary insanity through voluntary intoxication is for the jury and the burden of proving sanity beyond a reasonable doubt remains with the State. *Rice v. State*, Wyo., 500 P.2d 675, 676.

▪ The jury cannot convict of first-degree murder if it finds the defendant was so intoxicated as to prevent his forming the intent necessary to commit the crime or if there was reasonable doubt that he was capable of forming such intention. In *Edwards v. United States*, 84 U.S.App.D.C. 310, 172 F.2d 884 (1949), the court said, reversing the trial court:

"This appeal is from a conviction of housebreaking and larceny. There was testimony strongly tending to show that appellant was drunk when the acts were done. The court said in its charge to the jury: 'You must find, before you can acquit the defendant Edwards, that the defendant was so intoxicated that she was incapable of forming an intent.' We find no other language in the court's charge that seems to us to explain away the quoted statement. We think it erroneous. Incapacity need not be proved or found in order to entitle a defendant to an acquittal. It is true that no proof or finding of capacity is ordinarily necessary to support a conviction. But where a specific intent is essential to the crime charged, and *evidence is introduced that might create a reasonable doubt whether the defendant was sober enough to be capable of forming this intent the jury must be instructed to acquit if they have such a doubt. Davis v. State*, 54 Neb. 177, 74 N.W. 599. Cf. *Halloway v. United States,* 80 U.S.App.D.C. 3, 148 F.2d 665." [Emphasis supplied]

▪ Assuming, arguendo, that the defendant here properly contended for intoxication as a defense to first-degree murder and, in the process offered an instruction (as he did in this case), and further assuming, for the moment, that there was competent evidence to support the claim, he then had an absolute right, in these circumstances, to have his theory affirmatively conveyed to the jury through instruction. *State v. Hickenbottom*, 63 Wyo. 41, 178 P.2d 119, 131; *Blakely v. State*, Wyo., 474 P.2d 127, 129; *Thomas v. State*, Wyo., 562 P.2d 1287, 1292–1293; and *Benson v. State*, Wyo., 571 P.2d 595 (11–3–77).

▪ In *Blakely, supra,* we said:

"In order to meet the basic requirements of due process, it was necessary for the court in Blakely's trial to instruct on defendant's theory of the case . . ,"

and failure to do so resulted in a denial of due process. General instructions on the matter of criminal-intent burden of proof and the necessity to prove all elements of the crime beyond a reasonable doubt are insufficient to meet the due process requirements which dictate that the defendant will have his theory *affirmatively* presented to the jury by way of instruction. Justice Riner, of this court, in *State v. Hickenbottom, supra,* said that Hickenbottom's requested instruction "or one similar to it" should have been given; it was prejudicial error to refuse it; and defendant had a right to have his defense in the case "*affirmatively* " presented to the jury.

The right to an instruction such as is here at issue rests upon the conditions precedent heretofore noted, namely, the offered instruction must be sufficient to inform the court of the defendant's theory and there must be *competent* evidence in the record to support the theory. *Thomas v. State, supra,* citing *Blakely v. State* and *State v. Hickenbottom, supra.*

We said in *Thomas,* at 562 P.2d 1292–1293:

". . . Although there is considerable rebuttal of this and contention that this did not come into effect or operation until after defendant originally lost control of his car, *this in no manner dimin-*

*ishes the right to have the jury instructed upon defendant's theory of the case if there is competent evidence to sustain such theory, Blakely v. State, Wyo., 474 P.2d 127, 129; State v. Hickenbottom, 63 Wyo. 41, 178 P.2d 119, 131. Although we do not approve nor hold that this instruction is a complete or proper statement of the law . . . it was at least sufficient to advise the court of defendant's theory and should have been given, Blakely v. State, supra."* [Emphasis supplied]

The "competent," compared with "substantial," evidence rule, together with other pertinent concepts relevant here, is discussed in 23A C.J.S. Criminal Law § 1313:

"While it has been held that in order to warrant giving an instruction there must be some 'appreciable' or 'substantial' evidence supporting it, since, as appears in § 1138 *supra*, the weight and sufficiency of the evidence to establish a fact in issue are a question for the jury, *it is generally recognized that any evidence which will authorize the jury to find on it, although in the opinion of the court it may be weak, inconclusive, or unworthy of belief, is sufficient to justify an instruction on the issue raised by such evidence, and even positive testimony is not required, for it is sufficient if the fact in issue reasonably may be inferred from circumstances proved.* However, in order to warrant giving an instruction, the evidence should be sufficient fairly to raise the question involved therein.

"No instruction should be given which is not reasonably supported by the evidence, or which is not based on some theory logically deducible from some portion of the evidence. Thus an instruction should not be given on evidence which at the most merely raises a possibility or a conjecture, or which is inconsistent with

the physical facts, or which is so inconsistent and its connection so slight that the court may set aside a verdict thereon. *Where there is evidence which is otherwise sufficient to warrant giving an instruction on a defense theory, the court is not justified in refusing to charge because the evidence is contradicted by accused's own testimony,*[2] [Our footnote] or because it does not believe the evidence which supports it; but it is not error to refuse to charge on facts which appear only from accused's declarations out of court, and not testified to directly by him or by any other witness. Accused is entitled to an instruction on any theory of the defense if, and only if, it has support in the evidence. *For the purpose of determining whether an instruction in favor of accused should be given, the court must view the evidence in a light as favorable to him as is justifiable, and accused's testimony must be taken as entirely true."* [Emphasis supplied and footnotes omitted from text]

 Where the record reveals *no* evidence of the defendant's alleged intoxication he is, of course, not entitled to an intoxication instruction. We said in *Miller v. State,* Wyo., 560 P.2d 739, 740:

"Appellant asserts that the failure of the trial judge to instruct on the effect of voluntary drunkenness upon specific intent as a necessary element of burglary abridged his right to a fair trial. We cannot reach this question because no objection was made to the instruction given, nor was one submitted, *Moore v. State,* Wyo., 542 P.2d 109, 112; *Sims v. State,* Wyo., 530 P.2d 1176, 1181–1182; Rule 51, W.R.C.P. Additionally, there is no evidence in the record of defendant's intoxication. This claim appears only in defendant's summation, although the own-

---

2. We italicize this part of the sentence from the C.J.S. citation because in the interview and after more than 20 drinks in a five-hour time span, the defendant, while having testified that he was "drunker" at the time of interrogation than he was at the time of the shooting—also said that he wasn't drunk and that he knew what he was doing. We observe that the argu-

ment could be made that—after all this drinking, taken together with other statements and actions of the defendant—these contradictions might be considered by a factfinder to merely be the exhortations of a drunk man trying to convince his listener that he wasn't drunk. We do not intimate that *we* believe this to be so—*only that a fact-finder might be so persuaded.*

ers of the home who caught him in the process of the burglary were witnesses and could have been cross-examined upon this question. Absent any such evidence, an instruction upon this point would have been improper, *Shoemaker v. State*, Wyo., 444 P.2d 309, 310; *Brown v. State*, 80 Wyo. 12, 336 P.2d 794, 801; 4 Wharton's Criminal Procedure, § 538, p. 9 (C. Torcia Ed. 1976); 23A C.J.S. Criminal Law § 1312, pp. 762–764."

The question for decision finally becomes this:

Was there competent evidence of intoxication to compel the court to give an instruction on the intoxication theory of defendant's case?

## CAPSULIZED EVIDENCE OF INTOXICATION

In a five-hour time span, the defendant had 20 drinks of beer and whiskey—he testified he knew what he was doing "at times." He said he was "drunker" when he gave his statement two hours after the shooting than he was when Donna was killed—having had two additional drinks. At one point, the defendant said, "I'm not drunk"; at least he wasn't so drunk but that he could recognize the officer when he came in the bar. He had a lot to drink on the day in question, but he thought he was in control. He twice stated that he did not know what happened between the time he started arguing with Donna and when she was lying on the floor. At one point in the interrogation, he said, "I don't know what's going on." He stated that he could not "really remember things" (that happened at or about the time of the shooting), but "maybe tomorrow I can, but right now I can't."

When the defendant came to the bank teller's window—although he could read and write, he had her make out his check and withdrawal slip. The teller testified that she thought he had been drinking because "I could tell it when he talked." When the defendant leaned on the teller's window ledge, she could smell the alcohol.

## CASE LAW ON THE RIGHT TO AN INTOXICATION INSTRUCTION

The case of *People v. Jackson*, 14 N.Y.2d 5, 247 N.Y.S.2d 481, 196 N.E.2d 887, where defendant was convicted of first-degree murder, presented a question strikingly similar to the issue before the court here. In *People v. Jackson*, defense counsel requested an instruction to the jury

" 'that although intoxication is no defense, the defendant may have been so intoxicated as to be unable to form a specific intent to commit the crime charged.' "

The court refused to so charge

" 'because there is no evidence in this case from which the Court could conceivably come to a finding of the defendant being intoxicated.' "

The trial court went on to say that while there was evidence that the defendant had consumed a certain amount of liquor, this was not sufficient to warrant the giving of the instruction. The court of appeals observed that it is conceded that if a proper request for instruction on intoxication had been made, it should have been given. The opinion states, at 247 N.Y.S.2d 483, at 196 N.E.2d 888:

"The request, although imperfectly phrased, was adequate and it is certain that the court understood its import and refused it solely because, so the court thought, there was no evidence of intoxication. The District Attorney on argument here seemed to concede that there was such evidence. We summarize it briefly.

"Wallace Wood, in whose home defendant met deceased, had testified that he brought home a fifth of whiskey that evening and that Wood and deceased 'had been drinking' before defendant arrived at the Wood house. Wood said, describing an argument between deceased and defendant, that 'we were drinking whiskey' and after the argument stopped 'we start drinking again'. Wood said that he did not know how much defendant drank but that the three consumed all the whis-

key although some of it before defendant arrived. The witness did not notice that defendant staggered when he left the house. The People put into evidence oral admissions made by defendant to a police officer including defendant's statements that after dinner he had several drinks in a bar and that he then took a walk during which he met friends on the street and had a few drinks out of a bottle they proffered. A hypothetical question to the prosecution's witness Dr. Winkler had recited the consumption by the three men of the fifth of whiskey. A hypothetical question to defense witness Dr. La Burt had assumed that there actually took place all the drinking described in defendant's statements as well as in Wood's testimony. More important on this issue are the numerous references in the medical testimony to 'pathological intoxication' and to the dire effect on a man in defendant's condition of drinking even a little whiskey. Also, the detectives testified to a strong smell of alcohol on defendant's breath, even some hours after the crime. Both counsel summed up to some extent as to intoxication but the court never mentioned it in connection with intent.

"*We hold that the trial court's refusal to charge as requested was, especially because this is a capital case conviction, grave error.*

"The judgment should be reversed and a new trial ordered." [Emphasis supplied]

The lower court refused to give a requested intoxication instruction and defendant was convicted of breaking and entering with intent to commit rape, the evidence showing the defendant had 10 rum and cokes prior to the entry; the Supreme Court of New Hampshire reversed in *State v. Caldrain*, 115 N.H. 390, 342 A.2d 628, 629 (1975). The testimony was that the defendant smelled of alcohol, his speech was slurred and he staggered. The court said:

"The defendant in this case is charged with a crime of specific intent. *Cf. State v. Brough*, 112 N.H. 182, 291 A.2d 618 (1972); *State v. McMillan*, 115 N.H. 268,

339 A.2d 21 (1975). His intent at the time he broke and entered the home of Mrs. Clemons is a separate element of the offense charged. Evidence of his conduct is relevant on the issue of his intent but if there is substantial evidence of intoxication, the jury may consider whether 'intoxication could prevent the formation of the requisite intent.' *State v. Warren*, 114 N.H. 196, 197, 317 A.2d 566, 567 (1974); Annot., 8 A.L.R.3d 1236 § 4 (1966). *See also* RSA 626:4 (effective November 1, 1973), which provides: 'Intoxication is not, as such, a defense. The defendant may, however, introduce evidence of intoxication whenever it is relevant to negate an element of the offense charged, and it shall be taken into consideration in determining whether such element has been proved beyond a reasonable doubt.'

"*It is only when the evidence furnishes no rational basis for jury consideration of the requested instruction that it may be refused. State v. O'Brien*, 114 N.H. 233, 317 A.2d 783 (1974); *State v. Bacon*, 114 N.H. 306, 319 A.2d 636 (1974). There was substantial evidence of intoxication in this case and the defendant was entitled to have the jury instructed that they could consider intoxication in determining whether he had the requisite intent." [Emphasis supplied]

In *People v. Piranian*, 47 A.D.2d 668, 364 N.Y.S.2d 542, 543, the following memorandum opinion was rendered:

"MEMORANDUM BY THE COURT.

"Appeal by defendant from a judgment of the County Court, Nassau County, rendered March 21, 1974, convicting him of assault in the second degree and disorderly conduct, upon a jury verdict, and imposing sentence.

"Judgment reversed, on the law, and new trial ordered. No issues of fact were raised on this appeal and none were considered.

"In view of defendant's testimony to the effect that on the day of the crimes charged he had consumed nine bottles of

**412**

beer and was 'fairly intoxicated', the jury could have found that at the time in question he was too intoxicated to intend to prevent a peace officer from performing his lawful duty, and, accordingly, the trial court erred in not charging the jury in this regard (*People v. Lee*, 35 N.Y.2d 826, 362 N.Y.S.2d 860, 321 N.E.2d 781)."

In *State v. Frankland*, 51 N.J. 221, 238 A.2d 680, the defendant was accused and convicted of a specific-intent crime. He testified he was too drunk to remember the events in question because he had consumed 15 drinks of Scotch and water. The intermediate court set the verdict of guilty aside for the reason that the defendant had not urged intoxication as a defense and, therefore, the trial judge was not justified in giving the jury the intoxication instruction. In reversing, the supreme court held that the trial court was warranted in giving an intoxication instruction, even though the defendant had not urged voluntary intoxication as a defense and that his only defense was a denial that he had committed the act. The court said:

"We reverse and reinstate the conviction. Clearly, the question of defendant's intoxication was raised by the evidence adduced at trial. The defendant testified that he had consumed fifteen drinks of scotch and water and could not remember the events of the evening. Surely under these circumstances the jury was entitled to be instructed on the effect of a finding by them that the defendant committed the act but did not know what he was doing. The trial judge was well within his discretion in charging on a question of law raised by the evidence in the case, even though the instruction was not requested by either party. It was in the interest of justice to give to the jury for their guidance the applicable law on this subject placed before them by the evidence, and the trial court did not err in so doing. *State v. Sawyer*, 365 S.W.2d 487, 495 (Mo.Sup.Ct.1963). Indeed, had the trial judge failed to charge on this evidence of intoxication, the defendant well might argue that such failure was reversible error despite the lack of a request to

so charge. See *People v. Kent*, 10 A.D.2d 662, 196 N.Y.S.2d 154 (App.Div., 4th Dept.1960)." Ibid., 238 A.2d p. 682.

 In determining whether the issue of voluntary intoxication was fairly raised in the instant case, we must take the appellant's testimony as entirely true with respect to the alcohol he consumed—even though his testimony is contradictory in several respects—and we must view all other evidence in a light favorable to him for purposes of these considerations. 23A C.J.S. Criminal Law § 1313, *supra*. Since both the defendant *and* the State proffered an instruction on intoxication, thus recognizing the defense theory on this issue, and, given the quantities of alcohol involved, the statements made and the actions of the appellant before and after the shooting, the assurance of a fair trial requires an affirmative consideration of the intoxication issue by the jury under proper instructions. It was, therefore, error for the court to have refused to instruct on this theory of appellant's defense.

## KILLING AN UNBORN CHILD

 Our conclusions, pertaining to the voluntary-intoxication instruction, apply only to the charge of first-degree murder. They are in no way intended to apply to the charge of killing an unborn child. In *Gustavenson v. State, supra*, this court emphasized that the fact of intoxication is material when a showing of premeditation, or other specific intent, is required. We hasten to point out that no premeditation is required for the crime of killing an unborn child. The applicable statute, § 6–71, W.S. 1957, 1975 Cum.Supp., provides in pertinent part:

"Whoever unlawfully kills an unborn child, . . . by any assault or assault and battery wilfully committed upon a pregnant woman, knowing her condition, is guilty of a felony . . . ."

There is no requirement that an assailant "purposely and with premeditated malice" kill an unborn child; nor is any other requirement of specific intent disclosed.

There must only be a willful assault, or assault and battery, upon a pregnant woman, with knowledge of her condition.

## OTHER ASSERTED ERRORS

Since this case must be remanded for a new trial, we consider it advisable to treat certain other alleged errors which may there arise.

In the trial court, the defense argued that the denial of self-defense instructions deprived the defendant of another of his affirmative defenses and was contrary to the holdings in several specifically named Wyoming cases, which we have heretofore considered herein, i. e., *Hickenbottom, Blakely* and *Thomas, supra.* Much of what we have said about the offered voluntary-intoxication instruction is applicable here. One of our tasks is to determine whether there was competent evidence to support the instruction. *Thomas v. State, supra.* We have discussed that problem before. If there was not—the defendant is not entitled to the instruction. *Miller v. State, supra.* We must also inquire whether accident and self-defense—where the entire testimony on both issues is given by the defendant—are incompatible defenses and, therefore, in law, mutually exclusive.

Appellant relies on his statement to the police that Donna Poole had threatened "to fix" him and that she grabbed for the gun. There was evidence that might support the finding that there had been a struggle. The rifle discharged very close to the decedent and her arm was bruised. The shirt appellant had been wearing was torn. All of this evidence was competent, but we must ask whether it fairly raises the issue of self-defense and whether this defense and the defense of accidentally killing are legally inconsistent and incompatible defenses in these circumstances. We said in *Mewes v. State*, Wyo., 517 P.2d 487, 488–489:

". . . The obvious nature or quality of the plea of self-defense is that of

justification or excuse for an otherwise unlawful homicide or assault and battery. . . ."

This record reveals no defense contention that the defendant intended to kill or even purposely shoot the deceased. He said it was an accident or—in some instances—it was his testimony that he could not remember what happened. This means he did *not* intend to shoot her or—at least—he had no recollection of an intention to protect himself by shooting Donna Poole. Therefore, he is not contending for an "unlawful homicide" (*Mewes, supra*), which, because he sought to defend himself, was justified. Just the opposite appears in the record. He said he did not need a gun to defend himself against Donna Poole. He testified through his statement that

"[s]he grabbed ahold of the gun and I grabbed ahold of it too, and we started scuffling over it and that's when it went off. That I know for sure. *But I don't need a gun. Not for a woman.*" [Emphasis supplied]

■ On the question of self-defense and accident being inconsistent defenses, we said in *Mewes, supra,* at 517 P.2d 489:

". . . Additionally we find persuasive the case of *State v. Peal*, Mo., 463 S.W.2d 840, 841, which holds that when the defendant claims the shooting was accidental he is not entitled to an instruction on self-defense as that would be inconsistent, *Cleghorn v. State*, 55 Wis.2d 466, 198 N.W.2d 577, 579. . . ."

Since there was no evidence of self-defense at the time of the shooting[3], we hold the instruction upon that theory to have been properly refused.

■ With respect to other instructions, we hold the trial court did not commit plain error in instructing the jury as follows:

"YOU ARE INSTRUCTED that under the laws of the State of Wyoming, the willful or intentional, deliberate or wanton use of a deadly weapon in a deadly

---

**3.** We are not overlooking the evidence to the effect that Donna made a threatening remark and they both reached for the gun. Up to this point a self-defense argument is tenable—but there is *no* evidence that the defendant then intended to discharge the gun against Donna Poole in order to protect himself.

and dangerous manner gives rise to the presumption that the act was done maliciously.

"In order for an implication of malice to arise from the use of a deadly weapon, it must appear that its use was willful or intentional, deliberate or wanton."

The instruction given properly states the Wyoming law on the deadly-weapon doctrine. *Cullin v. State*, Wyo., 565 P.2d 445 (1977); *Smith v. State*, Wyo., 564 P.2d 1194 (1977); *Vigil v. State*, Wyo., 563 P.2d 1344 (1977); *Dodge v. State*, Wyo., 562 P.2d 303 (1977); and *Ballinger v. State*, Wyo., 437 P.2d 305 (1968).

Neither did the trial court err in refusing to give appellant's requested instruction concerning the defense of accident and the burden of proof relative thereto. Reading all of the instructions together, we are convinced that the State was not relieved of the burden of proving intent beyond a reasonable doubt (*Cullin v. State, supra*), nor do we find, in this case, the confusion present in *United States v. Corrigan*, 10 Cir., 548 F.2d 879 (1977). For similar reasons, we find no error, in this case, originating in the trial court's refusal to instruct on the weight to be given to appellant's voluntary statement. *Raigosa v. State*, Wyo., 562 P.2d 1009 (1977).

## FEASIBILITY OF REDUCTION TO SECOND–DEGREE MURDER

We do not find justification to reduce the conviction to second-degree murder and we believe it advisable to explain why. If the jury were to accept the evidence of the State and further believe the defendant capable of formulating the intention to kill Donna Poole, under a proper instruction concerning intoxication—the murder would, indeed, be in the first degree.

There is circumstantial evidence in the record which could reasonably give rise to an inference of premeditation—for example: (1) Witnesses testified to previous altercations between the parties where the defendant slapped the deceased and pulled her hair; (2) there was forensic evidence of bruises on the deceased's arm which probably came from fingers; (3) witnesses testified that just prior to the shooting they heard a female yelling, "Stop it! Stop it! Stop it!"; and (4) defendant's statement discloses that he and the deceased had been having an argument, for some period of time, over a woman defendant had been seeing, and that just prior to the shooting the deceased stated that she was going to talk to the other woman and "fix him up good."

In these circumstances, we would not be justified in reducing the conviction and thus relieving the defendant of his obligation to society to stand trial for murder in the first degree on the charge of killing Donna Poole with premeditated malice and, if found guilty, to pay the price.

Appellant's first-degree murder conviction is reversed. The conviction for killing an unborn child stands affirmed. The case is hereby remanded for a new trial on the charge of first-degree murder in the death of Donna Poole, in conformity with what has been herein expressed.

Reversed in part and affirmed in part; and remanded for new trial.

GUTHRIE, Chief Justice, specially concurring.

The offer of an instruction on intoxication by the prosecution leaves a clear inference to me that defendant had, during the proceeding, asserted the defense of intoxication and recognized the burden of the State to meet this claim; and also, the recognition that there was evidence to justify such instruction. The writer wishes to suggest to trial judges, when faced with this question, that it is not their function or province to weigh the evidence but to determine if it exists. The factual situation in this case demonstrates the wisdom of the suggestions contained in the case of *People v. Cram*, 12 Cal.App.3d 37, 90 Cal.Rptr. 393, 398, which suggests that whenever there is any evidence of intoxication, discretion should dictate to the trial court to instruct on this matter or secure a waiver from defense counsel and thus remove from the appellate court the responsibility of weighing the evidence of such intoxication to

determine if it is substantial. See *People v. Puckett*, 44 Cal.App.3d 607, 118 Cal.Rptr. 884, 890; [1] and *People v. Rodriquez*, 274 Cal.App.2d 487, 79 Cal.Rptr. 187.

The writer finds of some interest and possible applicability the case of *People v. King*, 29 Ill.2d 150, 193 N.E.2d 790, 793, in which case the defendant did not assert the defense of intoxication but the court gave such instruction upon its own motion over the objection of defendant, and complaint was made of this on appeal. The court held that such instruction was properly given. See also, *Dye v. State*, 220 Ga. 113, 137 S.E.2d 465, 467.

RAPER, Justice, dissenting in part and concurring in part.

I dissent in part and concur in part.

The majority has selected the most insignificant issue in the case upon which to reverse. The record discloses that the defendant never at any time contended that he was so intoxicated that he was unable to form an intent to kill. It is to the contrary. The defendant took a firm stand that he knew clearly what he was doing at all times. He relied upon his recollection of events leading to the shooting of his victim, which he set out in a statement to the police, as a basis for his defenses of accident or self-defense. If he had consumed so much liquor as to not be able to form an intent, he would likewise be unable to recall the details of his crime, which he so vividly did.

There was no record kept of opening and closing statements, so it is impossible to determine whether the defendant ever argued the point. The only mention by counsel of drinking was by one single question to one juror in the voir dire and that was to the effect that the defendant should not be prejudiced because a "little bit" of drinking was involved.[1] There was not one word said in defendant's motion for judgment of acquittal that the defendant was too intoxicated to form an intent to kill. His sole defenses were that the killing was an accident or in self-defense. The record is completely barren of any theory of any defense based upon intoxication.

The defendant did not testify on his own behalf. None of the defendant's evidence intimated any drunkenness on his part. The defendant's own statement introduced into evidence as a part of the State's evidence discloses no evidence of drunkenness, the defendant consistently asserting that he was not drunk and knew what he was doing. His statement is lucid and rational.

Defendant's cross-examination of officer Johnson, who took the statement, was not directed to establishing how drunk the defendant was but to establish how honest and accurate defendant was in the statements he made to the police. In his brief, defendant's counsel argues that the defendant's statement was corroborated in over 100 instances by the testimony of officer Johnson.

During the trial, there was no emphasis at all placed upon defendant's state of intoxication as bearing upon his capacity to form the necessary premeditation or intent nor was it ever any part of the theory of his case as reflected by the record.

There was no such evidence of the defendant's state of drunkenness that the court would be required to give an instruction on the application of such evidence. Such an instruction only becomes important when the evidence is such that the jury could find that the defendant "was so drunk as to be incapable of premeditation, or of forming any deliberate intent." *Gus-*

---

1. This suggestion based upon evidence which consisted only of finding empty beer cans and an odor of alcohol on defendant's breath.

1. "Mr. Laird:

 \* \* \* \* \* \*

"Is there anyone here who is a member of any group or belongs to any religious affiliation that opposes drinking of any alcoholic beverages?

"There is going to be some testimony that some of the participants in the situation were drinking a *little bit.* Anybody that frown [sic] on that, anybody here who because of any religious affiliation doesn't believe in drinking alcohol? Anybody?

 \* \* \* \* \* \*"

(Emphasis added.)

**416**

*tavenson v. State*, 1902, 10 Wyo. 300, 322, 68 P. 1006, 1010. The defendant's own declaration that he knew what he was doing completely refutes any now afterthought of his counsel that such an instruction was necessary. There is no evidence that defendant was in such a state. Those who saw him shortly after commission of the crime could only say he had been drinking. No one testified that he was drunk. The two officers who arrested him in a bar, not long after the killing, testified he was not drunk. In the absence of evidence of drunkenness and particularly when the defendant himself repeatedly asserted he was not drunk and knew what he was doing, we have no right to assume that the jury would have any basis to find he was too inebriated to shape premeditation and intent.

Mere evidence of drinking prior to the commission of a crime does not establish intoxication and require the giving of an instruction thereon. *People v. Turville*, 1959, 51 Cal.2d 620, 335 P.2d 678, cert. den. 360 U.S. 939, 79 S.Ct. 1465, 3 L.Ed.2d 1551, citing *People v. Price*, 1913, 207 Cal. 131, 277 P. 316. Where there is evidence of drinking but no evidence of intoxication and the defendant does not claim intoxication, there is no justification for an instruction covering such a theory. *Igo v. State*, 1954, Okl.Cr.App., 267 P.2d 1082.

In a homicide case, there is no requirement to instruct a jury on the matter of intoxication, where the defendant does not rely upon it as a defense. *People v. Miller*, 1962, 57 Cal.2d 821, 22 Cal.Rptr. 465, 372 P.2d 297. The mere fact that the defendant may have been drinking prior to the commission of a homicide is not enough to require an instruction on intoxication, in the absence of a showing that the drinking had such a substantial effect on him that he could not harbor intent. *State v. Edgin*, 1974, 110 Ariz. 416, 520 P.2d 288.

The evidence must be such that a jury would be warranted in considering intoxication as creating a reasonable doubt as to the capacity of the defendant to entertain the intent to commit the alleged crime. It is not error to refuse an instruction on intoxication when the evidence is not such as to justify a jury seriously considering it in determining intent. *State v. Gunn*, 1942, 102 Utah 422, 132 P.2d 109.

It is a well-settled concept in this and other jurisdictions as well that only such instructions should be given as arise from and can be based upon the evidence. *Thomas v. State*, Wyo.1977, 562 P.2d 1287; *Oldham v. State*, Wyo.1975, 534 P.2d 107; *Shoemaker v. State*, Wyo.1968, 444 P.2d 309.[2] There was no evidence present here which would justify the jury even considering that the defendant was so drunk that he did not know what he was doing, particularly when he personally refuses to take such a position.

The trial judge obviously saw the full lack of any reliance by defendant upon intoxication, than we are able to discern in the absence of a full record of opening and closing statements. Additionally, there can be undesirable implications to the defense of a defendant arising from the offered instructions, specifically that position which states that "Drunkenness shall not be an excuse for any crime" * * * taken directly from § 6–16, W.S.1957. The defendant was in all likelihood better off without the instruction. I can understand the State offering the instruction; it would have been to its advantage. I cannot see how the outcome of the trial would have possibly been any different with a drunkenness instruction.

While I would likewise affirm the conviction for killing the unborn child of the victim, Donna Poole, in violation of § 6–71, W.S.1957, 1975 Cum.Supp., that statute also carries with it an element of intent, being worded as follows:

"Whoever unlawfully kills an unborn child, or causes a miscarriage, abortion or premature expulsion of a fetus, by any assault or assault and battery *wilfully*

---

2. The trial judge is under no obligation to instruct the jury on a defense theory not clearly supported by the evidence. *Des Jardins v. State*, Alaska 1976, 551 P.2d 181; *State v. Ferrick*, 1973, 81 Wash.2d 942, 506 P.2d 860, cert.

den. 414 U.S. 1094, 94 S.Ct. 726, 38 L.Ed.2d 552; *State v. Caruthers*, 1974, 110 Ariz. 345, 519 P.2d 44; *Wyatt v. State*, 1961, 77 Nev. 490, 367 P.2d 104.

committed upon a pregnant woman, knowing her condition, is guilty of a felony and shall be imprisoned in the penitentiary not more than fourteen years." (Emphasis added.)

"Wilfully" is synonymous with "intentional." *Hay v. Peterson*, 1896, 6 Wyo. 419, 45 P. 1073, 1078, 34 L.R.A. 581. See also 45 Words and Phrases, "Willful; Wilfully," pp. 274, et seq.

The majority is inconsistent in requiring a new trial for killing Donna Poole but not the child. If there was some illusory chance that the defendant was unconscious, as the standard required by *Gustavenson v. State*, supra, then he ought to have the benefit of the same bonus as to the unborn child, as well. Scienter is basic to the crime of killing an unborn child.

I have no disagreement with the remaining portions of the majority opinion. I would have fully affirmed the district court in every respect.